**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

Lance Newkirk, Dorothy W., and Christopher G., on behalf of themselves, and all those similarly situated,

*Plaintiffs,*

vs.

Frances Pierre, Commissioner of the Suffolk County Department of Social Services, in her official capacity,

*Defendant.*

1 9-cv-4283 (NGG)(SMG)

# CLASS ACTION COMPLAINT

## PRELIMINARY STATEMENT

1. Plaintiffs Lance Newkirk, Dorothy W., and Christopher G., as well as the members of the proposed class they seek to represent, are impoverished individuals with physical or mental disabilities who reside in Suffolk County and have applied for or are receiving benefits and services from the Suffolk County Department of Social Services ("SCDSS") to meet their basic needs for nutrition, health care, income, and shelter.

2. SCDSS administers and provides a number of public benefits and services to low-income individuals and families residing in Suffolk County, including: the Supplemental Nutrition Assistance Program ("SNAP"), a federally-funded nutrition assistance program (commonly referred to as "food stamps"); Medicaid, a cooperative federal-state program that provides a wide range of medically necessary health care services; and Temporary Assistance ("TA"), a cooperative federal-state program that provides temporary income assistance and housing supports. Each of these programs has an application process requiring those wishing to access the benefits to apply online (SNAP, Medicaid) or in person at one of five SCDSS service centers

(SNAP, Medicaid, TA). Applicants and recipients must meet the specific requirements of each program to be eligible for and to continue to receive benefits, including periodic recertification.

3. Plaintiffs challenge the discriminatory actions and omissions based on disability by Defendant Frances Pierre, Commissioner of SCDSS, which have resulted and continue to result in denial, loss or limited access to benefits and services to which Plaintiffs and members of the Plaintiff Class are entitled by law.

4. Plaintiffs all have physical and/or mental impairments that substantially limit one or more of their major life activities, including blindness or visual impairments that cause them to require benefits applications in accessible formats or to need other assistance in completing the application process, physical disabilities that cause them to be unable to visit SCDSS locations to complete the application process in person, or mental health disabilities or other cognitive impairments that cause them to need assistance in understanding and completing the application process.

5. Plaintiffs' disabilities may also cause them to need adjustments in the form or manner in which Defendant delivers entitlements for Plaintiffs to have equal opportunity to access them.

6. Thus, due to their disabilities, Plaintiffs require reasonable modifications to Defendant's policies and procedures (often referred to as "reasonable accommodations") in order to participate in or benefit from the benefits and services to which they are entitled.

7. Title II of the Americans with Disabilities Act (Title II or ADA), 42 U.S.C. § 12131 *et seq.*, and Section 504 of the Rehabilitation Act (Section 504), 29 U.S.C. § 794(a), require Defendant to provide reasonable accommodations to Plaintiffs and Plaintiff Class members to enable them to access SNAP, Medicaid, and TA. Although Suffolk County has a policy mandating

provision of reasonable accommodations, Defendant has failed to effectively operationalize and implement this policy within SCDSS, leaving benefits applicants or recipients who present with a need for reasonable accommodations and/or who specifically request them without a consistent and effective method of obtaining them. Defendant thus routinely fails to meet her obligations under the law, due to a widespread failure of SCDSS staff and their supervisors to ensure that reasonable accommodations are provided to Plaintiffs and Plaintiff Class members.

8. As described in detail below, Defendant's ongoing failure on a countywide basis to ensure her agency provides legally required accommodations to Plaintiffs and the Plaintiff Class has denied them the opportunity to participate in or benefit from public services for which they are eligible. As a result of this deprivation, Plaintiffs and members of the Plaintiff Class have been and continue to be irreparably harmed—left without the food assistance, health care, income assistance, and shelter to which they are entitled under the law.

9. For example, Plaintiff Christopher G.'s cognitive learning disability makes multiple stages of the benefits application and renewal process extremely challenging. He requires assistance in understanding the application's instructions and questions, and in reading and comprehending periodic notices he receives from SCDSS regarding his benefits. Although he has repeatedly requested assistance with filling out benefits-related forms, he has not received consistent assistance from SCDSS workers, either in person or over the phone. Further, he has consistently explained to SCDSS that he is unable to understand the notices he receives in the mail, but SCDSS continues to send notices without providing further assistance in understanding the information contained therein. Because of his inability to understand notices, in April 2019, he lost access to SNAP and TA because he failed to request an appeal within ten days of receiving a notice

of termination. As a result, he did not have SNAP benefits to purchase food, could not pay his rent for May, and fretted that he would be evicted and become homeless.

10. Plaintiff Christopher G.'s case is but one example of Defendant's failures, which are widespread and persistent. Specifically, Defendant fails to:

a. Consistently provide prompt, clear, and accessible information to Plaintiffs and the Plaintiff Class about how to request or access reasonable accommodations needed to participate in or benefit from Defendant's SNAP, Medicaid, and TA programs, or to otherwise exercise their rights under the ADA and Section 504 in interactions with SCDSS;

b. Enact, implement, monitor, and enforce systemic and countywide policies to ensure that SCDSS provides appropriate screening and comparable methods to identify Plaintiffs and Plaintiff Class members as persons with disabilities who require reasonable accommodations to participate in or benefit from Defendant's SNAP, Medicaid, and TA programs;

c. Enact, implement, monitor, and enforce systemic and countywide policies designed to consistently provide reasonable accommodations on an ongoing basis, as needed, to Plaintiffs and Plaintiff Class members who are appropriately identified as requiring or having requested accommodations in order to participate in or benefit from Defendant's SNAP, Medicaid, and TA programs;

d. Enact, implement, and enforce countywide systemic policies to maintain adequate records of those clients who have requested reasonable accommodations and/or who already have been determined by Defendant to require such accommodations to participate in or benefit from Defendant's

SNAP, Medicaid, and TA programs so as to ensure continued meaningful access to these benefits for Plaintiffs and the class;

e. Enact, implement, and enforce an effective grievance procedure available to Plaintiffs and Plaintiff class members, to provide prompt and equitable resolution of disputes in all instances when a reasonable accommodation is either denied or is not provided in the manner or form requested, or whenever SCDSS otherwise violates the rights of Plaintiffs under the ADA or Section 504;

f. Develop, implement, and provide adequate, periodic training to SCDSS employees on the rights of benefits applicants and recipients with disabilities under the ADA and Section 504, and the systemic, countywide policies the agency utilizes to address those client rights.

11. Accordingly, Plaintiffs seek permanent declaratory and injunctive relief on behalf of themselves and a proposed class defined as: All Suffolk County residents with disabilities who: (1) have applied for or will apply for SNAP, Medicaid, or TA, from SCDSS since July 1, 2018 and are entitled to reasonable accommodations in the application process to participate in or benefit from these programs; and/or (2) have been found eligible for such programs and are entitled to reasonable accommodations to enjoy equal opportunity to participate in or benefit from them.

**JURISDICTION AND VENUE**

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States.

13. Declaratory relief is authorized by 28 U.S.C. §§ 2201(a), 2202, and by Rule 57 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 57. Injunctive relief is authorized by Rule 65 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 65.

14. Venue is proper within this Court pursuant to 28 U.S.C. § 1391(b)(1), because the Defendant resides within this district and is a resident of New York State. Venue is also proper within this Court pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims in this Complaint occurred in this district.

## PARTIES

15. Plaintiff Lance Newkirk is a resident of Suffolk County, New York.

16. Plaintiff Dorothy W. is a resident of Suffolk County, New York.

17. Plaintiff Christopher G. is a resident of Suffolk County, New York.

18. Defendant Frances Pierre is the Commissioner of the SCDSS. Pursuant to New York State law, Defendant is responsible for the operation and administration of all federally funded social services programs and benefits in Suffolk County including, but not limited to SNAP, Medicaid, and TA, as well as social services provided by New York State within the county. She is sued in her official capacity.

## CLASS ACTION ALLEGATIONS

19. Plaintiffs are impoverished persons with disabilities who have applied for or are receiving, or who will apply for public benefits and services in Suffolk County as more fully described herein. They bring this action on behalf of themselves and all others similarly situated, pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

20. Plaintiffs define the class as:

> All Suffolk County residents with disabilities who: (1) have applied for or will apply for Supplemental Nutrition Assistance Program ("SNAP"), Medicaid, or Temporary Assistance ("TA"), from the Suffolk County Department of Social Services ("SCDSS") since July 1, 2018 and are entitled to reasonable accommodations in the application process to participate in or benefit from these programs; and/or (2) have been found eligible for such programs and are entitled to reasonable accommodations in order to enjoy equal opportunity to participate in or benefit from them.

21. The Plaintiff class is so numerous that joinder of all members is impracticable. While SCDSS does not maintain records that directly or reliably identify all of its SNAP, Medicaid, and TA applicants and recipients who have disabilities, publicly-available data demonstrates that there are significant numbers of these individuals living in Suffolk County who, on information and belief, are eligible for benefits based on income. Moreover, Defendant maintains data on the thousands of individuals applying for and receiving benefits that are available solely to people with disabilities. Thus the numerosity requirement of Rule 23(a) is amply met.

22. The New York State Welfare Management Systems (WMS) produces a report that lists by county the number of applications for each benefit that are received every month. The WMS "WinR 4113" reported that in the month of January 2019, Defendant received 2,745 applications for Temporary Assistance, including emergency assistance, 2,663 applications for SNAP, and 3,255 applications for Medicaid. WMS also produces a report that states the number of active cases for which Defendant is administering benefits and services. In January 2019, Defendant was providing benefits and services in 7,004 TA cases, 53,858 SNAP cases, and 65,385 Medicaid cases.

23. These numbers represent the norm. Defendant's 2018 Annual Report stated, for example, that an average of 55,978 households received SNAP benefits every month in that year.[1]

24. A significant percentage of these applications and active cases are for individuals with disabilities and households that include members with disabilities. Recent U.S. census data from the American Community Survey shows 141,355 individuals with a disability residing in Suffolk County, comprising 9.5% of the county population.[2] The disabilities of these persons include difficulties with hearing, vision, cognition, ambulation, self-care, and independent living.[3]

25. Persons in Suffolk County who are disabled and living in poverty comprise an even more specific core demographic of individuals potentially eligible to receive public benefits from SCDSS. Census data shows the correlation between disability status and poverty status for Suffolk County residents. As of 2017, of the Suffolk County residents identified as having a disability, 6% were living at less than 50% of the poverty level; 13.3% were living at less than 100% of the poverty level; and 17.2% were living at less than 125% of the poverty level.[4] People living at or below 125% of the poverty level are typically eligible for he entitlements at issue in this action.

26. Adult TANF (federal TA) and SNAP recipients have disabilities at significantly higher rates than adults in the general population; 42.9% of adult TANF recipients and 42% of

---

[1] *2018 Annual Report 18*, Suffolk County Department of Social Services (2018) https://www.suffolkcountyny.gov/Portals/0/formsdocs/socialservices/2018%20Annual%20Report.pdf (accessed June 5, 2019).

[2] *Selected Social Characteristics in the United States, 2017: 2013-2017 American Community Survey 5-Year Estimates, Suffolk County, N.Y.* (Table DP02), U.S. Census Bureau, https://factfinder.census.gov/bkmk/table/1.0/en/ACS/17_5YR/DP02/0500000US36103.

[3] *Id.*

[4] *Selected Characteristics of People at Specified Levels of Poverty in the Past 12 Months, 2013-2017 American Community Survey 5-Year Estimates, Suffolk County, N.Y.* (Table S1703), U.S. Census Bureau, https://factfinder.census.gov/bkmk/table/1.0/en/ACS/17_5YR/S1703/0500000US36103.

adult SNAP recipients reported mental, physical or emotional problems that prevented or limited their ability to work, which was more than twice the rate of all adults.[5] Moreover, approximately 10% of TANF and SNAP recipients had disabilities that severely limited their ability to care for themselves and engage in routine daily activities, almost five times the percent of all adults with disabilities reporting this measure.[6]

27. In addition, Defendant does maintain data on the number of recipients to whom she provides services in programs that are *exclusively* available to people with disabilities. For example, SCDSS' Annual Report for 2018 included 22,819 Medicaid/SSI and 4,882 Medicaid Chronic Care cases in 2018.[7] SSI recipients are by statutory definition "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see also id.* § 1382. SSI recipients are also categorically eligible for SNAP and Medicaid and could receive state authorized emergency assistance benefits in qualifying circumstances. *See* 42 U.S.C. § 1383c.

28. There are numerous questions of law and fact common to the proposed class, including whether, through customs, policies, patterns, and practices, Defendant has violated and continues to violate the rights of Plaintiffs, as applicants and recipients of benefits administered by Defendant and as qualified individuals with disabilities, under the Americans with Disabilities

---

[5] Pamela Loprest & Elaine Maag, *Disabilities Among TANF Recipients: Evidence from the NHIS 14*, The Urban Institute (May 2009), https://aspe.hhs.gov/system/files/pdf/75831/report.pdf

[6] *Id.*.

[7] *2018 Annual Report 10*, Suffolk County Department of Social Services (2018), https://www.suffolkcountyny.gov/Portals/0/formsdocs/socialservices/2018%20Annual%20Report.pdf (accessed June 5, 2019).

Act and the Rehabilitation Act by, *inter alia*, failing or refusing to afford adequate ADA and Section 504-compliant:

a. accommodations to Plaintiffs and class members that they need to participate in or benefit from SNAP, Medicaid, or TA;

b. procedures for informing persons with disabilities of their rights to non-discrimination, and to request reasonable accommodations;

c. procedures to provide timely, adequate, written determinations of agency decisions pertaining to requests for reasonable accommodations;

d. procedures for informing applicants and recipients with disabilities of a prompt and equitable grievance process if their requests for reasonable accommodations or rights under the ADA and Section 504 are denied;

e. procedures for sufficiently recording applicants and recipients' disabilities and the status of reasonable accommodations requested and provided, both within a case and across SCDSS benefit programs, to ensure proper implementation of their rights of Plaintiffs and the proposed class under the ADA and Section 504; and,

f. to consistently and adequately make available to Plaintiffs and other interested persons information regarding the provisions of the ADA and Section 504 and their applicability to persons with disabilities seeking access to benefits administered under SNAP, Medicaid, or TA, and further, to make this information available in a manner necessary to apprise these persons of these protections, including through alternative means of communication for persons

with vision or hearing impairments or with cognitive disabilities that impair or prohibit comprehension of and ability to navigate program requirements.

29. The Named Plaintiffs' claims are typical of the claims of the proposed Plaintiff Class. Each Named Plaintiff and all members of the proposed class have applied for, are currently receiving, or will apply for SNAP, Medicaid, and/or TA from Defendant. The Named Plaintiffs have all experienced harm as a result of the Defendant's failure or refusal to provide reasonable accommodations to participate in or benefit from these programs and services. Similarly, all proposed class members, as qualified applicants and/or recipients of these benefits are entitled to reasonable accommodations based on their disabilities and have or will experience harm with regard to access and participation in SCDSS programs and services as a result of Defendant's systemic failure or refusal to provide them with reasonable accommodations.

30. The Named Plaintiffs will fairly and adequately protect the interests of the proposed Plaintiff class. In supporting their individual claims, the named Plaintiffs will simultaneously advance the claims of absent class members.

31. The Named Plaintiffs and the proposed class are represented by the Empire Justice Center and the National Center for Law and Economic Justice, whose attorneys are experienced in public benefits and disability class action litigation and will adequately represent the class.

32. Plaintiffs' claims satisfy the requirements of Rule 23(b)(2) of the Federal Rules of Civil Procedure, because Defendant has acted on grounds generally applicable to the named Plaintiffs and each absent member of the proposed class, thereby making appropriate final injunctive relief and declaratory relief with respect to the proposed class as a whole.

## STATUTORY AND REGULATORY FRAMEWORK

### A. Americans with Disabilities Act

33. Congress enacted the Americans with Disabilities Act in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Congress specifically found, *inter alia*, that "discrimination against individuals with disabilities persists in such critical areas as . . . access to public services." *Id.* § 12101(a)(3).

34. In enacting the ADA, Congress further declared that "individuals with disabilities continually encounter various forms of discrimination, including . . . failure to make modifications to existing facilities and practices . . . ." 42 U.S.C. § 12101(a)(5).

35. With respect to an individual, the ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1); *see also* 28 C.F.R. §§ 35.104, 35.108.

36. Within the ADA statutory definition of "disability," "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). "Major life activities" also include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Id.* § 12102(2)(B).

37. Congress has adopted statutory rules of construction concerning the ADA definition of disability. An impairment that is "episodic or in remission" must still be considered a disability "if it would substantially limit a major life activity when active." 42 U.S.C.

§ 12102(4)(D). Additionally, an impairment that substantially limits only one major life activity "need not limit other major life activities in order to be considered a disability." *Id.* § 12102(4)(e). Further, "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of [specified] mitigating measures . . . ." *Id.* § 12102(4)(E)(i).

38. Title II of the ADA covers state and local governments and their departments and agencies and requires these "public entities" to refrain from discrimination against persons with disabilities with respect to access to public programs, activities, benefits, and other services. 42 U.S.C. §§ 12131-12134.

39. Title II specifically provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

40. Title II of the ADA further defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

41. As mandated by Congress, 42 U.S.C. § 12134, the U.S. Attorney General, through the U.S. Department of Justice ("DOJ") has promulgated regulations that flesh out and implement the specific requirements of Title II of the ADA applicable to all services, programs, and activities provided or made available by public entities. 28 C.F.R. §§ 35.101, 35.102.

42. The DOJ regulations implementing Title II specify: "No qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity." 28 C.F.R. § 35.130(a).

43. The DOJ regulations implementing Title II describe specific prohibitions against disability-based discrimination. The regulations clarify, in relevant part, that to comply with the ADA: "A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability — (i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service; (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others . . . ." 28 C.F.R. §§ 35.130(b)(1)(i)-(ii).

44. The DOJ regulations implementing Title II additionally mandate that a public entity may not, "directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities . . . ." 28 C.F.R. §§ 35.130(b)(3)(i)-(ii).

45. The DOJ regulations implementing Title II of the ADA further require public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

46. The DOJ regulations implementing Title II of the ADA also require public entities with more than fifty employees to designate at least one person to coordinate their compliance responsibilities under the Act, to notify "all interested individuals" of the contact information for the coordinator, and to "adopt and publish grievance procedures providing for prompt and equitable resolution of complaints alleging any action that would be prohibited" by Title II of the ADA. 28 C.F.R. § 35.107.

47. DOJ regulations implementing Title II of the ADA further mandate that a "public entity shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1). Public entities must "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." *Id.* § 35.160(b)(1). The type of auxiliary aid or service necessary to ensure the mandate of effective communication "will vary in accordance with the method of communication used by the individual; the nature, length and complexity of the communication involved; and the context in which the communication is taking place." *Id.* § 35.160(b)(2).

48. To ensure that they are effective, public entities must provide auxiliary aids and services in a timely manner, in accessible formats, and in a way that protects the privacy and independence of the person with a disability. Public entities must also give "primary consideration" to the requests of a person with disabilities. 28 C.F.R. § 35.160(b)(2).

49. A public entity must not require a person with a disability, such as deafness, "to bring another individual to interpret for him or her" and must "not rely on a minor child to interpret

or facilitate communication, except in an emergency involving an imminent threat to the safety or welfare of an individual or the public where there is no interpreter available." 28 C.F.R. §§ 35.160(c)(1), (3).

### B. Section 504 of the Rehabilitation Act of 1973

50. Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.. . . ." 29 U.S.C. § 794(a).

51. Section 504 defines the scope of "program or activity" as including "all of the operations of – . . . (A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government . . . ." 29 U.S.C. § 794(b)(1).

52. DOJ has been charged by Executive Order 12250 with coordinating the implementation of Section 504 across federal agencies to ensure consistency in federal programs and state and local programs and activities receiving federal financial assistance from these agencies. 28 C.F.R. §§ 41.1, 41.2. The DOJ implementing regulations flesh out the statutory obligations and apply to each federal department or agency empowered to extend federal financial assistance. *Id.*

53. The U.S. Department of Health and Human Services ("HHS") regulations implementing Section 504 apply to each recipient of federal financial assistance from HHS, including Medicaid and the Temporary Assistance to Needy Families Program ("TANF") funding,

and to each program or activity that receives or benefits from such assistance. 45 C.F.R. §§ 84.1, 84.2.

54. The U.S. Department of Agriculture ("USDA") regulations implementing Section 504 apply to each recipient of federal financial assistance from the Food and Nutrition Service ("FNS"), including SNAP funding, and to each program or activity that receives such assistance. 7 C.F.R. §§ 15b.1, 15b.2.

55. The DOJ Section 504 regulations provide that "[n]o qualified handicapped person, shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity that receives or benefits from federal financial assistance." 28 C.F.R. § 41.51(a); *see also* 45 C.F.R. § 84.4(a) (same in HHS Section 504 regulations governing Medicaid and TANF); 7 C.F.R. § 15b.4(a) (same in FNS Section 504 regulations governing SNAP).

56. The DOJ Section 504 regulations define 'handicapped person' as "any person who has a physical or mental impairment that substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment." 28 C.F.R. § 41.31(a); *see also* 45 C.F.R. § 84.3(j)(1) (same in HHS Section 504 regulations governing Medicaid and TANF); 7 C.F.R. § 15b.3(i) (same in FNS Section 504 regulations governing SNAP).

57. The DOJ Section 504 regulations specify that a "recipient, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of handicap: (i) [d]eny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service; (ii) [a]fford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that

afforded others; . . . . [or] directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) [t]hat have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, [or] (ii) [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons . . . ." 28 C.F.R. §§ 41.51(b)(1)(i)-(ii), (3)(i)-(ii); *see also* 45 C.F.R. §§ 84.4(b)(i)-(ii), (b)(vii)(4)(i)-(ii) (HHS Section 504 regulations governing Medicaid and TANF); 7 C.F.R. §§ 15b.4(b)(i)-(ii), (b)(vii)(4)(i)-(ii)) (FNS Section 504 regulations governing SNAP).

58. The DOJ Section 504 regulations provide that a recipient of federal funding "shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program." 28 C.F.R. § 41.53; *see also* 45 C.F.R. § 84.12(a) (same in HHS Section 504 regulations governing Medicaid and TANF); 7 C.F.R. § 15b.13(a) (same in FNS Section 504 regulations governing SNAP).

59. FNS Section 504 regulations further specify that SNAP agencies "shall not discriminate against any applicant or participant in any aspect of program administration, including, but not limited to, the certification of households, the issuance of coupons, the conduct of fair hearings, or the conduct of any other program service for reasons of . . . disability. . . ." 7 C.F.R. § 272.6(a).

60. A recipient of funding from HHS employing 15 or more persons must designate at least one person to coordinate its compliance responsibilities under Section 504, and must "adopt grievance procedures that incorporate appropriate due process standards and that provide for the prompt and equitable resolution of complaints alleging any action prohibited" by Section 504. 45

C.F.R. § 84.7 (HHS Section 504 regulations governing Medicaid and TANF); *see also* 7 C.F.R. § 15b.6(a)-(b) (same in FNS Section 504 regulations governing SNAP).

61. Recipients of funding from both HHS and FNS must provide public notice that includes an identification of the person designated with Section 504 compliance responsibilities. 45 C.F.R. § 84.8(a) (HHS); 7 C.F.R. § 15b.7(a) (FNS).

### C. Administration of SNAP, Medicaid, and TA Programs in Suffolk County

62. The SNAP, Medicaid, and TA programs in New York State receive significant federal funding. As a condition of receiving this funding, the state must submit comprehensive plans to the federal government and provide periodic reports to the federal agency that supervises the particular program. 7 U.S.C. § 2020(e); 42 U.S.C. §§ 602(a)(1), 1396a.

63. The day-to-day operation and administration of the SNAP and TA programs are managed by local social services districts in New York State, including SCDSS. *See* N.Y. Soc. Serv. Law §§ 62(1), 131(1).

64. Local social services such as SCDSS districts also furnish medical assistance under the Medicaid Program to eligible persons found in their respective territories. *See* N.Y. Soc. Serv. Law §§ 363-a, 365.

65. Each of the benefit programs administered by SCDSS has its own application processes and requirements for eligibility, which are set forth in federal and state law, regulations and policy guidance.

66. Defendant's responsibilities in administering these programs consist of processing applications from county residents and determining eligibility, administering the benefits, recertifying benefits for recipients, and discontinuing benefits and determining penalties and

sanctions for program violations, including the work rule requirements in the SNAP and TANF funded Family Assistance program.

67. To apply for any public assistance program or benefit, a written application or document must be submitted. N.Y. Comp. Codes R. & Regs. tit. 18, § 350.1(b) (generally); *Id.*, § 387.6 (SNAP). In addition, benefit programs require submission of documentation and supplemental information to verify eligibility criteria are met. *Id.* §§ 351.2, 387.8, 387.9. The application forms for these programs run as long as 25 pages (not including instructions) and the applicant has the "primary responsibility" for verifying eligibility, through "providing documentary evidence to support statements on the application and to resolve any questionable information." *See, e.g.*, 7 C.F.R. § 273.2(f)(5)(i) (SNAP); N.Y. Comp. Codes R. & Regs. tit. 18, § 351.1(b)(2) (TA).

68. Applicants must provide documentary verification of eligibility factors including but not limited to income, immigration or alien status, citizenship, housing, utility and medical expenses, social security numbers, residency, identity, disability (if applicable), household composition and child support obligations and payments. *See, e.g.*, 7 C.F.R. § 273.2(f)(1) (SNAP);42 C.F.R. §§ 435.945, 953, 956 (Medicaid); 45 C.F.R. §§ 206.10 (TANF); N.Y. Comp. Codes R. & Regs. tit. 18, §§ 351.1, 351.5 (TA). If written confirmation cannot be obtained or is insufficient to establish eligibility or benefit level, SCDSS eligibility workers may require "collateral contacts" by third parties to orally confirm household circumstances or home visits. *See, e.g.*, 7 C.F.R. § 273.2(f)(4)(ii)-(iii) (SNAP); N.Y. Comp. Codes R. & Regs. tit. 18, §§ 351.5(b), 351.6 (TA). SCDSS must provide assistance in obtaining verification, when necessary. *See, e.g.*, 7 C.F.R. § 273.2(f)(5)(i) (SNAP); 42 C.F.R. § 435.908 (Medicaid); N.Y. Comp. Codes R. & Regs. tit. 18, § 351.5(a) (TA).

69. For example, to qualify for SNAP, individuals and families must meet complex eligibility rules, including financial eligibility standards;[8] status requirements including residency, household composition, and citizenship and immigration status; and procedural rules, such as verifying eligibility with multiple documents. *See generally*, 7 C.F.R. §§ 273.8 - 273.11. Unless "physically or mentally unfit for employment" or otherwise exempted, specified single adults must also comply with work rules as a condition of receiving SNAP benefits and may lose their benefits for as long as two years and nine months for non-compliance with these rules. 7 U.S.C. § 2015(o)(2), (3).

70. Further, SNAP applicants must verify in detail a range of specified eligibility factors and have a face-to-face or telephone interview with the agency to establish eligibility. 7 C.F.R. §§ 273.2(e)-(f); N.Y. Comp. Codes R. & Regs. tit. 18, §§ 387.7, 387.9(a)(7).

71. To qualify for Medicaid, individuals must meet correspondingly complex eligibility rules, including financial eligibility standards that vary by eligibility category; status requirements, such as those relating to residency and citizenship and immigration status; and procedural rules, such as eligibility verification. See generally, 42 C.F.R. §§ 435.403, 435.601, 435.907.

72. New York has established two Temporary Assistance (TA) programs: Family Assistance, which is funded through the federal TANF block grant and is available, up to a five year life time limit, to families with a child under 18 and to pregnant women, and Safety Net Assistance, which is available to families who have reached the federal five year time limit for TANF and childless adults. N.Y. Soc. Serv. Law §§ 158, 349; see generally id. § 350(2).

73. Eligibility for TA is determined based on what income and resources an applying household has available to meet their most basic needs. The available TA grant provides distinct allowances that combine to form the total household public assistance grant. N.Y. Soc. Serv. Law

---

[8] Income must fall below 130% of the federal poverty line. The 2018 federal poverty guideline, published by the U.S. Department of Health and Human Services, is an annual income of $21,330 for a family of three. *See*
Annual Update of the HHS Poverty Guidelines, 84 Fed. Reg. 1167-02, 1168 (Feb. 1, 2019).

§ 131-a (2); N.Y. Comp. Codes R. & Regs. tit. 18, §§ 352.2, 352.3, 352.5. Households applying for TA must complete a face-to-face interview and provide written verification of myriad eligibility factors including but not limited to: household composition; income; residence; cost of shelter; identity; citizenship status; and household expenses. N.Y. Comp. Codes R. & Regs. tit. 18, §§ 350.3, 351.2, 351.5, and 351.6. Both applicants for and recipients of TA are required to comply with work rules as a condition of eligibility. N.Y. Soc. Serv. Law §§ 335-b, 336.

74. Temporary Housing Assistance (THA) is a form of Temporary Assistance that is made available to an eligible homeless individual or family to meet the immediate need for shelter. 18 N.Y.C.R.R. § 352.35(b)(4).

75. THA is a form of emergency assistance. As such, Defendant is required to process applications for this program expeditiously. *See* N.Y. Soc. Serv. Law § 133.

76. New York regulations require Defendant to conduct an assessment of THA applicants at the time of application. N.Y. Comp. Codes R. & Regs. tit. 18, § 352.35(b)(1). This assessment must include a determination of whether "physical or mental impairments may result in behavior or actions that interfere with the individual's or family's ability to comply with THA requirements, or the ability to access and maintain housing other than temporary housing." Temporary Housing Assistance: Consolidation and Clarification of Policy, 16-ADM -11, p. 12, N.Y. State Off. Of temp. and Disability Assistance (Nov. 3, 2016) http://otda.ny.gov/policy/directives/2016/ADM/16-ADM-11.pdf.).

77. By regulation, Defendant must give assistance to applicants and recipients who state that they cannot obtain the necessary information or verification on their own. N.Y. Comp. Codes R. & Regs. tit. 18, § 351.5(a).

78. Recipients of TA, SNAP and Medicaid must all periodically recertify, which means that the household must complete a new application form, participate in another interview where required and provided updated verification and documentation on factors impacting eligibility that

may have changed. 7 C.F.R. § 273.14 (SNAP); 42 C.F.R. §§ 435.945, 953, 956 (Medicaid); N.Y. Comp. Codes R. & Regs. tit. 18, §§ 351.20, 351.21, 351.22, 351.23 (TA) and 387.17 (SNAP).

**FACTS COMMON TO THE CLASS**

79. Defendant's administration of SNAP, Medicaid, and TA causes Plaintiffs and Plaintiff Class members to repeatedly suffer, or to be at imminent risk of suffering, delayed or lost benefits, or improper denials or terminations of benefits.

80. Individuals with physical and/or mental disabilities, as illustrated by Plaintiffs Lance Newkirk, Dorothy W., and Christopher G., frequently have difficulty with a number of tasks related to accessing and maintaining eligibility for SNAP, Medicaid, and/or TA. These include, but are not limited to the following tasks requiring reasonable accommodations:

a. Traveling to and standing in line at the SCDSS office due to mobility impairments, which requires being allowed to transact case-related activities by telephone, mail, facsimile, email, or through home visits and/or having SCDSS workers come out to sit and speak with benefits recipients with mobility impairments workers;

b. Reading or completing written forms due to blindness or serious visual impairment, which requires assistance from SCDSS office workers or the conversion of written materials into alternate formats, such as Braille, large font, audio recordings, or electronic formats that are compatible with assistive reading technology;

c. Reading and understanding written notices or completing written forms due to mental or cognitive impairments, which requires assistance from SCDSS office

workers with clarifying eligibility questions and other benefits-related information;

d. Obtaining third-party verification documentation, which requires assistance from SCDSS workers with notifying third-party sources and compiling relevant documentation;

e. Communicating orally by telephone or in person due to deafness or being hard of hearing, which requires communication through the use of American Sign Language or other interpreters, or assistive listening technology such as captioning or third-party relay operators.

81. Defendant and SCDSS staff routinely deny these modifications, thus denying Plaintiffs and members of the Plaintiff Class equal opportunity to benefit from Defendant's services.

82. The improper loss, denial, or lack of access to benefits and services occurs as a result of the ongoing failure or refusal of SCDSS staff, under the administration of Defendant, to enact and implement policies and procedures designed to ensure that Plaintiffs and members of the proposed class receive reasonable accommodations to which they entitled by law.

83. As discussed *infra*, at ¶¶ 84 - 148, while incorporating broadly-worded statements of compliance with the ADA and Section 504, Defendant's actual practices and, therefore, policies of non-discrimination based on disability are facially inadequate. In addition, Defendant has failed to operationalize its policies in a manner that ensures the rights of applicants and recipients with disabilities are protected. Among other deficiencies, Defendant fails to: (1) ensure that individuals with disabilities are sufficiently notified of their rights to request and receive reasonable accommodations; (2) ensure that applicants and recipients are screened for mental health or

cognitive disabilities giving rise to the need for reasonable accommodations; (3) ensure that applicants and recipients with "readily apparent" disabilities are provided necessary reasonable accommodations; (4) ensure appropriate procedures and training are in place to guide staff on the processing and granting of reasonable accommodations requests; (5) provide ongoing accommodations to persons with known disabilities who have received prior accommodations; and (6) provide an effective grievance procedure for persons whose reasonable accommodations requests have been denied or ignored.

### I. Defendant's Policy of Non-Discrimination Based on Disability, Which Conflicts with Federal Law

84. On May 26, 2017, the Suffolk County Executive enacted a Standard Operating Procedure for County Department Compliance with Laws Relating to Individuals with Disabilities (SOP B-08) (hereinafter referred to as "Suffolk County SOP B-08)"), which directs Suffolk County departments, including SCDSS, "to ensure that their programs and services do not discriminate on the basis of disability." https://suffolkpd.org/Portals/59/scpd_pdfs/infoandpolicies/SOP_B-08.pdf. The policy specifies that "qualified individuals with disabilities" residing in the county "shall have equal access to all benefits, programs and services for which they are eligible" in a non-discriminatory manner. *Id.*, at 2. The County obligates itself to make reasonable accommodations to the "known physical or mental limitations of otherwise qualified service applicants and recipients with disabilities," "when necessary to avoid discriminatory effect" on people with disabilities, and "to the extent practicable . . . eliminate or reasonably modify policies, practices and procedures that have a discriminatory impact." *Id.*

85. SCDSS has not enacted a departmental ADA policy directly in response to Suffolk County SOP-B08. Instead, on December 31, 2007 and as updated on June 14, 2014 and

subsequently on August 9, 2016, SCDSS enacted "Procedure # 899," which is a "Training/Implementation Procedure" entitled "Providing Access to Social Service Programs for Persons with Disabilities and/or Limited English Proficiency" (hereinafter referred to as "SCDSS Procedure # 899"). The stated purpose of this document is "[t]o ensure that applicants and recipients of Temporary Assistance (TA), SNAP . . . Medicaid" and other state public benefits "have equal access to all benefits, programs and services for which they are eligible, including those offered by other agencies operating on our behalf."

86. SCDSS Procedure # 899 covers program staff and supervisors in all the SCDSS Centers around the County as well contract agency staff who administer particular agency programs. Each Center has a Center Manager, supervisors for each program, and line staff who conduct most of the interactions with applicants and recipients. Procedure #899 requires "[l]ine staff and supervisors [to ensure] that persons with disabilities . . . are provided with any and all assistance they require while accessing [SCDSS] services and that the identified needs of the A/R [applicant/recipient] are met." SCDSS Procedure # 899 further directs SCDSS staff to document "any" A/R "limitations [and] necessary accommodations to ensure access and coordination of services," in addition to documenting this information in the "Welfare-to-Work Case Management System" or otherwise noted in the client's case record. Line staff and supervisors must also "ensur[e] that the opportunities afforded to qualified persons with a disability are equal to the opportunities afforded to persons without disabilities."

87. Suffolk County SOP B-08 states: "Individuals may qualify as disabled if . . . the impairment prevents or severely limits one or more major life activities…." Suffolk County SOP B-08, at 2. SCDSS Procedure # 899 does not state the ADA definition of "disability," nor does it contradict this definitional statement in Suffolk County SOP B-08.

88. As explained *supra*, DOJ regulations implementing Title II of the ADA state: "An impairment does not need to prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 28 C.F.R. § 35.108(d)(v).

89. Defendant's policy therefore contains an overly restrictive definition of "disability," in conflict with federal law.

90. Because of these deficiencies, SCDSS fails to properly identify persons with a disability, including Plaintiffs and the proposed class, who are entitled to request reasonable accommodations.

## II. Defendant's Failure to Operationalize and Implement Her Policy of Non-Discrimination Based on Disability

91. In addition to Defendant's failure to enact a non-discrimination policy comporting with federal laws, Defendant fails to operationalize and implement her existing policies, including failing to provide sufficiently detailed guidance and training to staff on how to process and grant requests for reasonable accommodations.

### A. <u>Defendant Does Not Provide Adequate Notice of Rights Under the ADA and Section 504.</u>

92. SCDSS continues to fail or refuse to provide Plaintiffs and members of the proposed class adequate notice of the protections afforded to them under the ADA and Section 504, including the right to request and receive reasonable accommodations in the application process and in the receipt of benefits.

93. SCDSS provides only minimal notice to some applicants and recipients with disabilities, including Plaintiffs and members of the proposed class, with respect to their rights under the ADA and Section 504.

94. The Suffolk County Office for People with Disabilities of the Suffolk County has issued a "Did You Know" outreach flyer (hereinafter referred to as "Did You Know flyer"), purportedly prepared jointly by that office and SCDSS. https://www.suffolkcountyny.gov/Portals/0/formsdocs/socialservices/ADA_DIDYOUKNOWFlyer.pdf?ver=2018-11-13-084728-500. On information and belief, the Did You Know flyer is not uniformly made available in person or by mail to SCDSS applicants or recipients with disabilities, including Plaintiffs and the proposed class.

95. Although some SCDSS Service Centers have posted 8 1/2" x 11" bulletin copies of the Did You Know flyer, they are often inconveniently located and/or inconspicuously displayed.

96. In person and/or over the telephone, SCDSS staff fail or refuse to regularly or uniformly provide information about the right to request and obtain reasonable accommodations to Plaintiffs and members of the Plaintiff Class.

97. As a result of Defendant's failure or refusal to provide notice of ADA rights afforded to persons with disabilities, Plaintiffs and the proposed class are unable to exercise their rights to request and receive reasonable accommodations under the ADA and Section 504, placing them at continuing risk of loss of, or deprival or access to SNAP, Medicaid, and TA.

**B. Defendant Fails to Ensure SCDSS Staff Screen for or Identify Applicants or Recipients with Potential Mental Health Disabilities or Cognitive Impairments.**

98. Individuals with mental health disabilities or cognitive impairments, including members of the proposed class, often have difficulty with a number of tasks related to accessing and maintaining eligibility for SNAP, Medicaid, and TA. These include, but are not limited to the following tasks, which require reasonable accommodations to be afforded by Defendant:

a. Understanding written notices related to eligibility for benefits, which requires explanation of the contents;

b. Obtaining third-party verification documentation, and completing applications and renewal forms, which requires assistance and extension of related deadlines;

c. Remembering or understanding the eligibility-related tasks, which requires assistance with oral and/or written explanations and reminders of and flexibility in scheduling appointments, requirements, and deadlines;

d. Interacting with others, including taking public transportation, and being in public settings, which requires being allowed to timely and effectively transact case-related activities by telephone, mail, facsimile, email, or through home visits, and/or being assigned a temporary housing placement with few or no roommates.

99. In addition, persons with mental disabilities may be unaware of, or may deny the existence of their disability, or may otherwise have difficulty presenting or self-disclosing their disability status or need for reasonable accommodations to others, including SCDSS staff. Accordingly, these individuals routinely experience lack of access, or imminent loss or denial of SNAP, Medicaid, or TA, due to their inability to comply with program requirements absent needed reasonable accommodations.

100. The New York State Office of Temporary and Disability Assistance ("OTDA") has instructed local districts, including SCDSS, to "make reasonable efforts to recognize potential disabilities, based on the applicant/recipient's disclosure or on an indication of an apparent disability," and to "use behavioral observations, historical data known to the agency or other

means to help identify those persons who may not be able to self-disclose existing physical or mental conditions to district staff," in order to "offer reasonable modifications in policies, practices, and procedures to make benefits, programs or services accessible for those persons." *See* "Providing Access to Temporary Assistance Programs for Persons with Disabilities and/or Limited English Proficiency (LEP)," 06-ADM-05, at 10-11, (N.Y. State Off. Of Temp. and Disability Assistance (Apr. 27, 2006), http://otda.ny.gov/policy/directives/2006/ADM/06-ADM-05.pdf.

101. In fact, OTDA has made available to local social services districts, including SCDSS, a screening tool known as the Modified Mini Screen ("MMS") Mental Health Screening, which is validated for use with public assistance populations and which OTDA states "may enhance districts' existing efforts . . . in identifying any necessary treatment or reasonable program accommodations." *See The Modified Mini Screen (MMS) Mental Health Screening Tool*, 15-ADM-04, 2, (N.Y. State Off. Of Temp. and Disability Assistance June 25, 2015), http://otda.ny.gov/policy/directives/2015/ADM/15-ADM-04.pdf.

102. Despite these directives, SCDSS does not utilize the state-sanctioned MMS screening tool or any other comparable methods to identify individuals with potential mental disabilities, whether cognitive, behavioral, or psychological. The failure to use any tool clearly violates federal law.

103. While SCDSS Procedure # 899 does state that "Line staff must make reasonable efforts to recognize potential disabilities, based on the applicant/recipient's disclosure or on an indication of an apparent disability," the policy does not identify how these "reasonable efforts" may actually be accomplished under any discernible standards, or supervised, monitored, or documented. Consequently, SCDSS eligibility workers or other staff do not regularly or uniformly

implement this directive, by employing behavioral observations, using historical client data, or utilizing other comparable means to attempt to identify individuals with potential or apparent disabilities.

104. As a result, individuals, including Plaintiffs and members of the proposed class, whose mental disabilities significantly impair their ability to comply with program eligibility requirements and procedures, or to request needed reasonable accommodations, do not regularly or uniformly receive accommodations necessary for them to access benefits.

### C. Defendant Fails to Ensure that Applicants and Recipients with "Readily Apparent" Disabilities are Provided Necessary Reasonable Accommodations

105. Suffolk County SOP B-08 states that each department, including SCDSS, "is permitted, as it sees fit, to make reasonable modifications for readily apparent disabilities with or without a request for accommodation." Suffolk County SOP B-08, at 3.

106. SCDSS has no policies or procedures designed to implement this directive or any comparable practice.

107. SCDSS staff accordingly does not regularly or uniformly make reasonable accommodations for applicants or recipients with disabilities, where their disabilities might be "readily apparent."

108. As a result, benefits applicants and recipients, including Plaintiffs and members of the proposed class with "readily apparent" disabilities such as mobility impairments, have been denied reasonable accommodations such as shortening wait times and being allowed to sit instead of stand without losing their place at the Service Center window line.

109. For example, Plaintiff Lance Newkirk, who walks with the assistance of a cane, explained multiple times to SCDSS workers that he was having extreme pain due to standing in line for a long period of time. SCDSS workers repeatedly told him just sit and wait for the line to

shorten before standing up to wait in line again. During a more recent visit, Mr. Newkirk and his wife, who uses a wheelchair, endured the same physical pain after they informed SCDSS workers that they both had disabilities that prevented them from sitting for long periods of time, but were still forced to wait for almost two and a half hours for their Fair Hearing to begin. After sitting for hours, Mr. Newkirk endured pain in his legs and lower back, a condition related to nerve pain caused by his knee injury. His wife also suffered through painful back spasms from sitting in her wheelchair for hours, and could not stretch out because she was confined to sitting and waiting for hours.

### D. Defendant Fails to Sufficiently Operationalize Procedures and Training to Guide Staff on the Processing and Granting of Reasonable Accommodation Requests

110. SCDSS lacks adequate procedures, policies, or practices reasonably enabling applicants and recipients with disabilities, including Plaintiffs and the proposed class, to request and receive needed reasonable accommodations.

111. SCDSS Procedure # 899 simply references situations where "an applicant/recipient requests an ADA accommodation from any DSS staff member," but does not otherwise clarify how staff are to recognize a "request" that is triggering a right accorded to persons with disabilities under the ADA and Section 504.

112. SCDSS does not regularly or uniformly utilize any policy, procedure, or practice, to allow oral requests for assistance to be processed as requests for accommodation under the ADA and Section 504.

113. Defendant's written materials do not, in whole or in part, convey sufficient guidance or instruction to SCDSS staff to adequately recognize requests for reasonable accommodation from applicants and recipients with disabilities, or to otherwise initiate a process

pursuant to the ADA or Section 504 that is designed to consider any comparable requests for assistance as requests for reasonable accommodation.

114. To the extent any of these policies do convey sufficient guidance or instruction to adequately recognize reasonable accommodation requests, SCDSS staff, as administered by Defendant, do not routinely or uniformly implement them.

115. Suffolk County SOP B-08 mandates that county departments, including SCDSS, provide a process "to grant an emergency accommodation where a Request for Reasonable Accommodation Form is not feasible, practical or available." Suffolk County SOP B-08, at 5. SCDSS Procedure # 899 has no comparable provision. SCDSS, as administered by Defendant, does not implement any policy, procedure, or practice to facilitate needed emergency accommodations for SNAP, Medicaid, or TA applicants or recipients with disabilities.

116. Suffolk County SOP B-08 defines a reasonable modification as "an adjustment to a benefit, program or service, performance method, or service delivery to meet the individualized needs of an individual, applicant, recipient or beneficiary with a disability." Suffolk County SOP B-08, at 3. The county policy describes the accommodation determination assessment as "an individual process" made with the person with a disability on a "case-by-case basis" and involving a "reasonable effort" by the county department to "determine the appropriate accommodation." *Id.*, at 4.

117. Suffolk County SOP B-08 specifies that the prescribed determination "should" involve assessing specified factors: (1) an analysis of the "essential functions" of the applicable program, service, or activity; (2) how the person's disability limits performance of the essential functions; (3) identification of the "effectiveness and feasibility" of the proposed accommodation;

and (4) "[c]onsidering the requester's preference, in order to select the accommodation "most appropriate for the requester and the department." Suffolk County SOP B-08, at 4.

118. SCDSS Procedure # 899 does not reference these decisional criteria or provide any other guidance to SCDSS staff on how they should be used. Accordingly, the policy does not provide guidance to the Center Manager regarding either the substantive standards or the collaborative, individualized process to be used in addressing and deciding requests for reasonable accommodations.

119. Rather, SCDSS Procedure # 899 merely lists a small number of examples of reasonable accommodations, including: (1) qualified interpreters; (2) modified work schedules; (3) "appropriate adjustment of examinations, training materials or local policies"; (4) "acquisition or modification of equipment or devices"; and (5) "[o]ther similar accommodations for persons with disabilities."

120. SCDSS Procedure # 899 also identifies "reasonable efforts to assist individuals with physical disabilities," separate from reasonable accommodations. Listed examples include: (1) providing readers to persons with visual impairments; (2) scheduling interviews "to minimize waiting time"; and (3) "eliminating unnecessary return visits." Persons unable to travel to a SCDSS Service Center due to physical or mental impairments may receive "a suitable accommodation," including: (1) telephone eligibility interviews; (2) the use of an authorized representative to conduct DSS business on their behalf; and (3) home visits, if "no other accommodation can be offered."

121. With respect to persons "having difficulty applying for Temporary Assistance and negotiating the system due to a mental impairment" the policy instructs SCDSS staff to determine

if the person can be helped through an "active Adult Protective, Child Protective case or an intensive Case Manager (ICM)."

122. The Did You Know flyer also lists examples of "assistance," that DSS workers can potentially provide, including those addressing the travel-related impairments referenced in SCDSS Procedure # 899. The flyer also lists: (1) help filling out applications or obtaining third-party eligibility verification; (2) explanation of "letters;" and (3) services to help prepare, support, or be excused from a "work activity."

123. Despite these examples, SCDSS staff have failed or refused, and continue to fail or refuse to implement or adhere to Suffolk County SOP B-08, SCDSS Procedure # 899, or the Did You Know flyer, with respect to the standards in those documents regarding reasonable accommodations for persons with disabilities.

124. Other than these limited policies, SCDSS has failed or refused to enact or implement any policy, procedure, or practice designed to: (1) provide guidance to staff, line workers, or eligibility workers regarding how to recognize requests or needs for reasonable accommodation of applicants and recipients with disabilities, including Plaintiffs and the proposed class, in order to facilitate referral to the Center Manager for resolution; or (2) provide guidance to the Center Manager regarding guidelines or standards to be used to grant or deny reasonable accommodation requests of these individuals.

125. In addition, SCDSS Procedure # 899 requires staff members to forward accommodation requests to their "immediate unit supervisor who will inform the Center Manager or designee," who ultimately made the decision to approve or deny the request.

126. However, benefits applicants and recipients with disabilities, including Plaintiffs and members of the proposed class, are routinely denied accommodations by SCDSS workers without the accommodation requests ever reaching unit supervisors or Service Center Managers.

127. For example, Plaintiff Christopher G., whose learning disability makes it difficult for him to read and fill out forms, recently received a notice from SCDSS about missing an appointment. He then went to the SCDSS Service Center to explain the reason for his failure to go to SCDSS at the designated time. While there, an SCDSS worker instructed him to fill out a form to explain his absence. Due to his disability, he was unable to fill out the form, so he requested an opportunity explain orally why he had missed his appointment and why he could not fill out the form he was given. The SCDSS worker did not forward this request to a supervisor and refused to allow him to explain his absence. SCDSS then terminated his benefits.

128. Further, SCDSS Procedure # 899 does not reference any time limit constraining the Center Manager's decision to approve or deny an accommodation request, whether an emergency situation may be involved, or whether decisions are to be made within the outer time limit of 60 working days, as specified in Suffolk County SOP B-08. Suffolk County SOP B-08, at 4.

129. SCDSS has also failed or refused to enact or implement any policy, procedure, or practice that operates to stay any pending program denials, terminations, or other sanctions regarding SNAP, Medicaid, or TA benefits, while the agency is making a decision regarding the reasonable accommodation requests of applicants and recipients with disabilities that are needed to access their benefits.

130. Suffolk County SOP B-08 states: "It is the responsibility of each department to ensure that all appropriate staff is trained regarding the ADA, the Rehabilitation Act and the contents of this SOP." Suffolk County SOP b-08, at 7.

131. Defendant has failed or refused to ensure that SCDSS staff, including eligibility workers, case managers, and staff receive, on an ongoing basis, timely and adequate training on the ADA and Section 504, as they pertain to benefits applicants and recipients with disabilities. This includes including training on: how to recognize requests for reasonable accommodations; how to process requests; the types of accommodations that may be requested; the chain of command for reviewing and deciding requests; timelines applicable to investigating and deciding requests; and how to raise and resolve disputes via the grievance procedure.

132. SCDSS staff thus routinely fail to provide Plaintiffs and members of the Plaintiff Class equal opportunity to access to SNAP, Medicaid, and TA benefits for applicants and recipients with disabilities, including Plaintiffs and the proposed class, because of workers' lack of knowledge about training topics described above.

### E. Defendant Fails to Provide Ongoing Accommodations to Persons with Known Disabilities Who Have Received Prior Accommodations

133. Defendant's failure to ensure that SCDSS appropriately record and track accommodations that have previously been requested and granted causes repeated violations of the rights of Plaintiffs and members of the Plaintiff Class.

134. In order to preserve ongoing access to benefits, documentation of applicants' and recipients' disabilities and reasonable accommodations in client case records is necessary to ensure that these individuals, including Plaintiffs and the proposed class, are not repeatedly forced to disclose and potentially verify their disabilities and need for reasonable accommodations.

135. SCDSS Procedure # 899 directs agency staff to document "any applicant/recipient (A/R) limitations [and] necessary accommodations" in the "Welfare-to-Work Case Management System," in order to "ensure access and coordination of services."

136. Despite this directive, SCDSS staff do not routinely or uniformly track the disability status and reasonable accommodation needs of applicants and recipients with disabilities in the Welfare-to-Work Case Management System, or any other comparable system. This effectively screens out individuals with disabilities from SNAP, Medicaid, and TA, by impeding the system-wide implementation of these individuals' rights under the ADA and Section 504. This constitutes a method of administration that operates to deny equal access to SNAP, Medicaid and TA benefits for these applicants and recipients with disabilities.

137. All three of the Named Plaintiffs have experienced challenges in applying for and recertifying benefits, as well as delays and interruptions to the receipt of benefits, due to Defendant's failure to provide ongoing reasonable accommodations by not tracking and updating the case management system to indicate the type of accommodations already granted to the individual.

138. For example, Plaintiff Lance Newkirk suffers great pain when he has to sit or stand for more than a few minutes. He was granted an accommodation that he would not have to wait in line when he came to Center if he called ahead of time. When he went to another Center for a fair hearing, he called and requested that he and his wife, who also has difficulty waiting due to disabilities, be seen right away. Despite the previous accommodation approval, the couple waited nearly 1 ½ hours on the day of the hearing.

139. Plaintiff Christopher G. has faced similar experiences. In February 2018, with the assistance of an attorney, Plaintiff Christopher G. requested accommodations of getting a learning disability test and having SCDSS workers explain written notices and benefits-related materials to him, but SCDSS never responded to his request.

140. A few months later in May 2018, after receiving a notice stating that he would be sanctioned for failure to go to a job assignment, Christopher G. requested a fair hearing and consequently followed up with SCDSS on the request for accommodations he had submitted.

141. SCDSS asserted that no such request was on file for Mr. G. and asked him to provide SCDSS with another copy of his accommodations request. SCDSS apparently had no prior record of such an accommodation being provided, and when Mr. G. filed a formal request to ensure that he would continue to receive assistance with reading and filling out forms and notices, SCDSS ignored him, did not properly record his request, or reach a determination.

142. Defendant's continued failure or refusal to track previously granted reasonable accommodations in order to provide ongoing accommodations to recipients results in Plaintiffs and members of the proposed class being continually subjected to an imminent lack of access to SNAP, Medicaid, or TA benefits and undue interruption of their benefits.

**F. Defendant Has Failed or Refused to Enact or Implement Adequate Grievance Procedures.**

143. Suffolk County SOP B-08 states that county "departmental decisions regarding reasonable accommodation" may be appealed to the "Department Head," to be reviewed "in conjunction with the Director of the Office of People with Disabilities." Suffolk County SOP B-08, at 5. Suffolk County SOP B-08 further states that county departments "must" follow the "Service Discrimination Complaint Procedure as specified in SOP B-07." *Id.*, at 7. The Suffolk County Office of the Executive's "Suffolk County SOP for Policy of Nondiscrimination in County Services and Service Discrimination Complaint Procedures (SOP B-07)," enacted on August 4, 2014 (hereinafter referred to as "Suffolk County SOP B-07"), mandates procedures for investigation and resolution of complaints regarding, *inter alia*, discrimination based on disability. Suffolk County Standard Operating Procedure for Policy of Nondiscrimination in County Services

and Service Discrimination Complaint Procedures, SOP B-07 ("Suffolk County SOP B-07"), at1, https://suffolkpd.org/Portals/59/scpd_pdfs/infoandpolicies/SOP_B-07.pdf. The policy directs each county department head, including SCDSS, to, *inter alia*: (1) select a "Title VI designee" to help develop and implement a "departmental plan" to publicize various county ""External Nondiscrimination Policy" compliance functions and complaint procedures, including using county materials, conducting public outreach, and referencing staff training; (2) employ the Title VI designee to receive "Service Discrimination Complaints," including those based on disability, and, following investigation, issue recommended decisions on those complaints, which are reviewed by the county department head. Suffolk County SOP B-07, at 2–9. The Service Discrimination Complaint procedure incorporates detailed provisions regarding filing deadlines, investigation, departmental determination, and administrative agency appeal. *Suffolk Count's Non-Discrimination Policy*, Suffolk County Gov., https://www.suffolkcountyny.gov/Elected-Officials/County-Executive/Minority-Affairs/Non-Discrimination-Policy .

144. Neither SCDSS Procedure # 899 nor the Did You Know flyer reference the requirements of Suffolk County SOP B-07, with respect to the mandated procedures for filing, investigating, and issuing agency decisions concerning complaints of disability-based discrimination. SCDSS Procedure # 899, at page 2, states that if an applicant or recipient "requested an accommodation and did not receive it, they may file an ADA grievance (appeal)," by calling or writing to an individual referenced, alternatively, as an "ADA Compliance Officer" or "the ADA contact." An "ADA Complaint Review Committee" is "responsible for monitoring investigation and resolution of complaints and for overseeing procedures" ensuring access to benefits and services. *Id*. The Did You Know flyer states that "complaints" of persons who feel they were not "properly assisted" may be submitted to the ADA Compliance Officer. An SCDSS

webpage also references filing ADA grievances regarding reasonable accommodations with an "ADA Compliance Officer." *See Americans with Disabilities Act (ADA) Information*, Suffolk County Office of the Executive, https://www.suffolkcountyny.gov/Departments/Social-Services/ADA-Information.

145. Public notice regarding available complaint procedures that may be used by applicants and recipients with disabilities, including Plaintiffs and the proposed class, to address discrimination by SCDSS in violation of the ADA and Section 504, is conflicting and misleading at best.

146. Plaintiffs and the proposed class are left with no clear means to challenge denials of reasonable accommodation requests which result in discriminatory lack of access to SNAP, Medicaid, or TA.

147. Defendant has further failed or refused to enact or implement any policy, procedure, or practice, whether contained within SCDSS Procedure # 899 or elsewhere, regarding:

a. What constitutes an appealable denial, in whole or in part, of a reasonable accommodation request;

b. Whether a failure or refusal to respond to an accommodation request is appealable;

c. Standards for investigation of appeals, including, *inter alia*, evidence to be obtained from witnesses and documentary sources;

d. Standards for appeal decisions, including written findings of fact based on evidence of record and conclusions of law;

e. Time limits for rendering appeal decisions, including whether they are varied in emergency circumstances; and

f. Whether applicants and recipients will be notified of written appeal decisions, if any, and whether the decisions will be placed in any client or agency case record.

148. SCDSS staff do not otherwise routinely or uniformly advise or notify applicants and recipients with disabilities, including Plaintiffs and the proposed class, of their right to submit grievances, appeals, or complaints regarding denials of accommodation requests, or lack of access to benefits or discrimination based on their disabilities.

## FACTS OF THE NAMED PLAINTIFFS

### A. <u>Plaintiff Lance Newkirk</u>

149. Plaintiff Lance Newkirk is a resident of Bay Shore, Suffolk County, New York. He and his wife currently receive Medicaid and SNAP benefits from SCDSS.

150. In 2013, Mr. Newkirk had an accident at work which permanently and severely injured his knee.

151. As a result, he has difficulty walking and standing and uses a cane. Standing for long periods of time causes him extreme pain and makes his knees swell. Sitting for long periods of time also results in nerve pain in his lower back, a condition that is related to his knee injury.

152. Because SCDSS repeatedly failed or refused to grant Mr. Newkirk the accommodation of being allowed to sit and wait to be assisted without losing his place in line and/or for SCDSS workers to assist him while he is sitting down, Mr. Newkirk has and continues to suffer further injury to his knee and faces imminent loss of access to benefits each time he is required to recertify his eligibility for them.

153. On March 27, 2018, Mr. Newkirk drove to a SCDSS Service Center to hand-deliver application forms and supporting documents for several of Defendant's benefits programs.

154. Mr. Newkirk did not see any signs for information about requesting reasonable accommodations for persons with disabilities.

155. Mr. Newkirk stood and waited in line for forty minutes in front of a window labeled "Drop-Off" but was told by the SCDSS worker at the window that he was in the wrong line and directed him to a different window.

156. Mr. Newkirk saw that the line he was instructed to enter was longer than the Drop-Off line. Already in excruciation pain after standing in line for 40 minutes, he explained to the SCDSS worker that he has difficulty standing for long periods of time due to his knee injury.

157. In response, the SCDSS worker told Mr. Newkirk to sit down and wait for the line to become shorter before getting up to stand in line again. The SCDSS worker gave no instructions for Mr. Newkirk to ensure that he could secure a spot in the line before sitting down in the waiting area.

158. Mr. Newkirk stood in line for another twenty minutes, then asked a SCDSS worker how much longer he would have to wait before he could drop off the documents. The SCDSS worker told him the same thing: sit and wait until the line is much shorter before getting up to stand in line again.

159. Mr. Newkirk asked if the SCDSS worker could give him a number to ensure that he did not lose his place in line before he sat down to wait, but the SCDSS worker refused. Instead, the worker instructed Mr. Newkirk to walk to a different line located on the other side of the building to get a numbered ticket.

160. Mr. Newkirk explained that he was in pain because he had been standing for an hour and requested to see a supervisor. The SCDSS worker told him he would have to sit and wait 10 to 15 more minutes before he could speak to a supervisor.

161. Due to a scheduled medical appointment, Mr. Newkirk could not wait any longer and left the Service Center without submitting his application materials.

162. Due to the amount of time he stood at the SCDSS Center, Mr. Newkirk's knee had swollen so much that he could not receive the cortisone shot that was the purpose of his medical appointment.

163. Subsequently, Mr. Newkirk sought the assistance of a public benefits attorney, who contacted SCDSS on behalf of Mr. Newkirk. Mr. Newkirk then received a phone call from a SCDSS Center Manager, who scheduled a time for Mr. Newkirk to come into the Center and complete the application.

164. The next day, the Center Manager assisted Mr. Newkirk with the application process. She also gave Mr. Newkirk her contact information so that he could call ahead and ask for assistance again when he is at the Service Center.

165. Mr. Newkirk did not receive anything in writing stating that his request for accommodation had been granted and that he would no longer need to stand and wait in line when seeking assistance at the Service Center.

166. In February 2019, when it was time for him to recertify, Mr. Newkirk returned to the Service Center to submit his completed recertification forms. Seeing another long line, he requested to submit the documents ahead of others in line due to his disability, but a SCDSS worker told him that he needed to wait for his turn and that he could sit and wait until the line became shorter before getting up to stand and wait in line again.

167. Mr. Newkirk asked to see the Center Manager who had previously assisted him and assured that accommodations would be provided, the SCDSS worker told him that the Center

Manager had retired. Mr. Newkirk asked to see another supervisor, but the worker told him that he would have to wait because the supervisors were all busy.

168. Mr. Newkirk was forced to go back to stand and wait in line again for another half hour before he could submit his recertification materials. At no point during his wait did a supervisor come out to speak with him about his granted accommodation.

169. In April 2019, Mr. Newkirk received a notice that SCDSS was reducing his SNAP benefits from $353 to $72 per month.

170. Disagreeing with the basis for this reduction, Mr. Newkirk requested a Fair Hearing.

171. On May 10, 2019, Mr. Newkirk and his wife arrived at the Service Center on the day of the scheduled Fair Hearing fifteen minutes before their appointment time. Mr. Newkirk waited for ten minutes at the window labeled "General Information and Appointments" where the SCDSS worker told him that he should check in through a phone on the wall near the entrance.

172. Mr. Newkirk informed the SCDSS worker over the phone that he and his wife were present for a Fair Hearing and that their disabilities made it difficult to wait for long periods of time. The SCDSS worker told Mr. Newkirk to take a number and to sit and wait until the number is called.

173. Mr. Newkirk and his wife sat and waited for two and a half hours when Mr. Newkirk's wife's back began to spasm painfully. Mr. Newkirk's leg and lower back were hurting him as well. Mr. Newkirk and his wife decided to leave and were packing up when their number was finally called.

174. The Fair Hearing lasted for about half an hour. When Mr. Newkirk and his wife left the Service Center two hours after arriving for their scheduled appointment, they were both in excruciating pain.

175. As a result of SCDSS' repeated denials of Mr. Newkirk's requests for accommodation, Mr. Newkirk has been prevented from accessing much needed SNAP benefits and suffered additional injury to his knee.

176. Also due to SCDSS' conduct, Mr. Newkirk faces the continued uncertainty and imminent risk of losing access to SNAP benefits each time he must submit documentation at a SCDSS Service Center because of his inability to sit or stand and wait for long periods of time.

177. Defendant's failure to enact policies and procedures to enforce the ADA and Section 504 rights afforded to applicants and recipients with disabilities has resulted in the deprivation of equal opportunity for Mr. Newkirk to participate in Defendant's programs.

**B. <u>Plaintiff Dorothy W.</u>**

178. Dorothy W. is a resident of Suffolk County.

179. Ms. W. has spastic diplegic cerebral palsy, which is a pediatric neuromuscular disorder. Ms. W. also has three individualized visual impairments: myopia, esotropia, and marked visual perceptual disorder.

180. Due to her visual impairments, Ms. W. can only read and fill out large-print documents and forms. She needs documents and forms to be in an electronic format so that she can use a screen magnifier program on her computer to enlarge documents to enable her to read the text since most large-print documents do not have the spacing necessary to facilitate reading by Ms. W.

181. In addition, Ms. W. has severe limitations in her lower extremities and thus uses a motorized wheelchair to travel. She also has myoclonic tremors in both hands.

182. Due to her hand tremors, Ms. W. is unable to write consistently, legibly and within the lines of printed fillable forms. Whenever possible, she uses a voice-activated program to write instead of typing.

183. In addition, Ms. W. must often rely a personal assistant to complete tasks that she is unable to perform independently. Without electronic documents or documents that are in large-print and adequate spacing, Ms. W. must rely on a scribe to read aloud the questions on the forms and write down the answers on Ms. W.'s behalf in order to complete the forms.

184. Ms. W. is a practicing attorney who experienced a decline in her income in 2017. She applied for the Medicaid Buy-In Program ("MBI") in the fall of 2018 by calling SCDSS to inquire about the application process. DSS sent Ms. W. a paper application in the mail.

185. On October 6, 2018, Ms. W. called SCDSS to explain that she had a disability and that she required electronic documents and forms in large print to be sent to her, or in the alternative, the assistance of a scribe to complete the MBI application forms.

186. The DSS worker did not respond directly to Ms. W.'s request for assistance and accommodation. Instead, the worker insisted that SCDSS only provided standard application packets. Ms. W. did not receive further assistance during the call and decided not to pursue applying for MBI at that time because it seemed too difficult to get assistance.

187. However, by February 2019, Ms. W.'s financial situation had not improved because her earnings had not increased. She could no longer afford health insurance.

188. Ms. W. called the Suffolk County Attorney's Office to explain her frustration with DSS concerning her prior attempt to apply for MBI and the lack of accommodations provided to her.

189. DSS then contacted Ms. W. to set up a face-to-face meeting or appointment with her at the DSS Smithtown Center. Ms. W. believed that the meeting was arranged so that she could receive assistance in filling out the forms in person.

190. Ms. W. had previously been to the SCDSS Smithtown Center and could not navigate very well in that location due to her visual perceptual disorder. She explained this to the DSS worker who arranged a meeting in the SCDSS Riverhead Center instead.

191. On February 28, 2019, Ms. W. met with a SCDSS worker at the Riverhead Service Center. The worker reviewed the information Ms. W. had brought with her, asked Ms. W. questions, and filled out the paper applications for MBI benefits based on the information and materials that Ms. W. had brought with her that day. The SCDSS worker then asked Ms. W. to sign the paperwork in order to complete the application. However, it did not appear to Ms. W. that the SCDSS worker was writing down her answers verbatim, as an official transcriber would be required to do.

192. Later, SCDSS sent Ms. W. a letter stating that further information was required in order to complete her MBI application.

193. Ms. W. called SCDSS Riverhead Center to explain that she had not been informed about what materials she needed to bring with her to complete the application. She repeated her request to receive notices, letters, and forms in large print or electronic format due to her disabilities. Ms. W. explained that this was necessary in order for her to read the documents and appropriately respond to SCDSS' requests and instructions to provide additional information.

194. The SCDSS worker on the phone with Ms. W. did not provide information about what paperwork was required for the MBI application, and was unaware of Ms. W.'s prior request for accommodations. The worker informed Ms. W. that her application was being forwarded to a "Ms. Clarke" at the SCDSS Ronkonkoma Service Center to determine Ms. W.'s eligibility.

195. Ms. W. next received a notice dated April 11, 2019 informing her that her MBI application had been denied due to a "lack of information."

196. Ms. W. requested a Fair Hearing to challenge the denial. She believed that she was eligible for the benefit at the time and would have successfully completed the application had she been informed by DSS what materials she needed to bring and had she received her requested reasonable accommodations from DSS during the application process.

197. SCDSS notified Ms. W. that her Fair Hearing had been scheduled for June 26, 2019.

198. On June 14, 2019, Ms. W. wrote a letter to DSS to request that access to her Case Record in order to examine it in preparation for her Fair Hearing. In her letter, Ms. W. specifically requested (1) copies of the documents to be presented at the hearing in support of DSS's position, (2) a summary of her case and DSS's position, if one has been prepared, (3) any and all records, notes and or internal e-mails related to her application and eligibility for the period between February 26, 2019 and May 30, 2019, (4) a list of employees working in the Medicaid unit in the Riverhead Center on February 28, 2019, the date her initial application was accepted and (5) copies of any written communications, records, or notes regarding her ongoing requests to DSS for accommodations in connection with her application for benefits.

199. Additionally, Ms. W. requested that these documents be sent to her in large print or electronic format in order to accommodate her disability.

200. In response to Ms. W.'s letter, SCDSS sent her only the case summary and told her that if she wanted to review other documents, she would have to make an appointment. The case summary that DSS sent to Ms. W. was not in the format she requested so she was unable to use her screen magnifier application on her computer to read the document.

201. Ms. W. also reapplied for Medicaid on May 24, 2019, but was again denied on May 30, 2019 due to lack of information. She was given a deadline of June 17, 2019 to provide the necessary additional information.

202. Realizing that she would need more time to gather and provide the detailed financial information that SCDSS was requesting, Ms. W. faxed a letter to SCDSS to request an extension of the deadline to July 8. She also requested assistance to complete the application because Ms. W. was unsure about the information she should provide.

203. Ms. W. successfully requested an appointment with SCDSS but was not able to review most of the documents because they were not in a format that she could read.

204. On June 22, 2019, Ms. W. received a letter from SCDSS denying her request for an extension to submit additional information by July 8. Instead, SCDSS extended her time to June 24, 2019. Ms. W. was unable to meet the deadline and did not submit additional information to DSS for her Medicaid application.

205. Ms. W. attended the Fair Hearing on June 26, 2019 accompanied by her representative and a personal assistant. Although Ms. W. requested the Fair Hearing to contest the initial denial of her Medicaid application, the hearing office instead focused on discussing what further evidence of income Ms. W. needed to submit for the second Medicaid application. Reluctantly, Ms. W. consented to the adjournment of the hearing and agreed to submit further documents to DSS to supplement her second Medicaid application.

206. After the hearing, Ms. W. submitted additional documentation to DSS about her income and assets.

207. Ms. W. received a notice from DSS dated July 9, 2019, stating that she was denied Medicaid. She also received a communication from the entitlements representative of her care coordination agency, stating that she had accessed the NYS computerized benefits system and it showed that Ms. W. was approved for Medicaid.

208. Ms. W.'s advocate from NSLS then received a notice from DSS dated July 17, 2019, stating that Ms. W. had been approved for MBI Medicaid. Ms. W. received a Medicaid card in the mail on July 22, 2019.

209. Ms. W. has suffered harm and hardship due to DSS's refusal to honor and follow through on her requests for reasonable accommodations. Ms. W. would have started receiving MBI Medicaid sooner if DSS had complied with the ADA. Ms. W. incurred considerable medical expenses and had limited income with which to pay for medical care while her application was pending. Further, DSS's failure to provide ADA reasonable accommodation delayed Ms. W.'s efforts to seek approval for the Home and Community Based Waiver Program that she needs to continue to be able to afford to stay in her home and hire a community habilitation worker to assist her with daily life activities.

210. Defendant has offered no assurances that it will provide reasonable accommodations when Ms. W. must recertify her eligibility or when she continues the process of applying for further entitlements.

### C. Plaintiff Christopher G., Proceeding Anonymously

211. Plaintiff Christopher G., proceeding anonymously, resides in East Patchogue, Suffolk County.

212. From a young age, Christopher G. has had difficulty reading, understanding, and filling out forms due to a learning or cognitive disability.

213. Christopher G. currently received SNAP, Medicaid, and TA benefits from SCDSS. Mr. G. has received these benefits intermittently for many years.

214. Each time Christopher G. is required to recertify or reapply for benefits, he has found it very challenging to read and understand the questions, to write his answers correctly, and to submit the forms and necessary documentation. Christopher G. also receives notices and letters from SCDSS, and has always had difficulty reading and understanding the information contained therein and, when required, following instructions to maintain his eligibility for benefits. Christopher G. can usually read most of the words and make out dates and places, but often misunderstands the notices and letters.

215. Because SCDSS repeatedly failed or refused to grant Christopher G. the accommodation of having SCDSS workers explain benefits-related material, including letters, notices, and application/recertification forms, and assist him in filling out forms, he has suffered undue termination of his benefits and continues to face imminent loss of access to his benefits each time he receives a notice or letter that he does not understand and/or fails to comply with eligibility requirements.

216. Christopher G. has told multiple SCDSS workers that he has trouble understanding notices and filling out forms, but he continues to receive them without assistance.

217. Sometimes, Christopher G. receives help with filling out the forms and reading SCDSS materials from friends. Infrequently, SCDSS workers assigned to interview him during the benefits application process would help him fill out application or recertification forms. Previously, he would call SCDSS to request clarification or explanation of notices and letters, but

he was usually put on hold for a very long time and given no opportunity to ask questions. Because SCDSS workers repeatedly hung up the phone during his calls, he stopped requesting assistance on the phone.

218. Christopher G. has never received a formal written response to any of his requests for assistance from SCDSS, nor has anyone from SCDSS reached out to inform him that he has a right to request assistance to accommodate his learning disability.

219. In November 2017, Christopher G. received a letter from SCDSS informing him that his TA benefits would be terminated for 150 days because he failed to submit job searches. His sister helped him read the letter and told him that the information he submitted to the Department of Labor ("DOL") was insufficient according to SCDSS.

220. Fearful of losing his TA benefits and becoming homeless, with the assistance of his sister Christopher G. requested a Fair Hearing to challenge the sanction.

221. Christopher G. brought to the hearing a letter from his treating physician, Dr. Susan Phelan, attesting to his mental and cognitive disabilities that make it difficult for him, without assistance, to complete assignments that involve reading, writing, and following instructions.

222. Christopher G. requested an adjournment so that he could request assistance from a lawyer before the hearing continued. After the hearing officer asked him some questions, Christopher G. believed that the hearing had been adjourned and left the Service Center.

223. However, upon meeting with an attorney the following week, he learned that he had lost the Fair Hearing and his request for an adjournment had not been granted. The Fair Hearing decision made no mention of Dr. Phelan's letter.

224. As a result of the attorney's intervention on behalf of Christopher G., SCDSS rescinded its sanction and reinstated his TA benefits.

225. The attorney also requested an accommodation to have Christopher G. tested for a cognitive or learning disability diagnosis and to have SCDSS workers explain notices and letters, and assist him with following instructions to maintain his eligibility for benefits. SCDSS never responded to Christopher G. or his attorney about the request.

226. In May 2018, Christopher G. again received a letter that he could not fully understand. His sister read the letter and told him that SCDSS was sanctioning him again for failure to attend a DOL appointment. After speaking with his sister, Christopher G. remembered that he had contacted DOL before the appointment and provided letters stating he had a medical appointment to notify them that he was not able to go to the DOL appointment. Christopher G., with the assistance of his sister, again requested a Fair Hearing to challenge the sanction.

227. An attorney represented Christopher G. at the Fair Hearing and demanded a response from SCDSS about his prior request for accommodations. SCDSS responded to the attorney that they did not have the request on file and asked for another copy. As a result of the attorney's intervention, SCDSS decided to rescind its sanction of Christopher G.'s benefits.

228. SCDSS also provided Christopher G. with an appointment at the Industrial Medical Association ("IMA") at the end of June 2018, which determined that he was exempt from the benefits work requirements for six months.

229. Besides the appointment with the IMA, Christopher G. never received a formal written response to his accommodations request. He did not receive any assistance from SCDSS workers with reading and understanding notices and letters he received after he made his request through his attorney.

230. In the beginning of April 2019, Christopher G. received a notice from SCDSS informing him that his benefits would be terminated due to his failure to go to an appointment at

the SCDSS Service Center. He had called SCDSS a week prior to the appointment to inform them that he was unable to attend due to a work conflict.

231. He went to the SCDSS Service Center the day after the scheduled appointment day where he was given an employment form to fill out to confirm that he missed his appointment because he was at work. Christopher G.'s friend, for whom he was working the day before, refused to fill out the employment form so he returned to the SCDSS Service Center to speak with a SCDSS case worker about the situation.

232. Christopher G. requested to speak with a SCDSS worker about his situation, but a SCDSS worker refused.

233. Christopher G. requested a Fair Hearing to challenge the imminent termination of his benefits, but because he was unable to fully comprehend the information in the letter, and no one from SCDSS explained the information or answered his questions, he failed to request a hearing within the ten day period, which would have enabled him to keep his benefits pending the result of a hearing.

234. Christopher G. attended the Fair Hearing alone and tried to explain as best he could why he could not attend the appointment and how he sought assistance from SCDSS to explain his whereabouts. No one at the Fair Hearing asked him about or mentioned his learning disabilities or his difficulty reading and understanding notices and filling out forms.

235. Following the hearing, Christopher G. contacted an attorney, who then contacted SCDSS on his behalf to request reinstatement of his TA benefits because he was not granted an accommodation that would have enabled him to comply with the eligibility requirements. SCDSS responded that because Christopher G. had lost his Fair Hearing, his benefits were to be terminated

and he needed to complete the more burdensome "new" application process in order to regain access to his benefits.

236. Christopher G. did not understand that he was eligible to reapply for benefits after losing the Fair Hearing because in his previous experience, he was not allowed to reapply during a specified period of time following termination of his benefits.

237. On May 10, 2019, Christopher G. went to the SCDSS Service Center to fill out a new application form. He did not receive assistance from SCDSS in filling out the forms. He spoke with a SCDSS case worker who processed his application and provided him with SNAP benefits and a rent voucher.

238. Because his benefits had been terminated, Christopher G. was not able to pay his rent on time and feared eviction and homelessness.

239. As a result of SCDSS's repeated denials of Christopher G.'s reasonable accommodation requests, and the aforementioned failure to make available information about his ADA and Section 504 rights, he has been prevented from accessing much needed benefits. Also due to SCDSS' conduct, he faces the continued uncertainty and risk of being deprived of access to SNAP and TA benefits each time he must recertify his eligibility for them by filling out forms without assistance and/or each time he receives a notice from SCDSS that he cannot understand because of his mental disabilities.

240. Defendant's failure to enact policies and procedures to enforce the ADA and Section 504 rights afforded to applicants and recipients with disabilities has resulted in the deprivation of equal opportunity for Christopher G. to participate in benefits programs.

## CLAIMS FOR RELIEF

**First Claim: Violation of the Americans with Disabilities Act: Discriminatory Denial of Access Due to Exclusion and Denial of Participation**

241. Each individual Plaintiff and member of the proposed class is a "qualified individual with a disability" under the meaning of Title II of the ADA, 42 U.S.C. § 12132(2) and 28 C.F.R. § 35.104, as an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by SCDSS.

242. Frances Pierre, in her official capacity as Commissioner of the SCDSS, is a "public entity," thereby rendering Defendant subject to the compliance requirements of the ADA. 42 U.S.C. § 12131(1)(A)-(B); 28 C.F.R. § 35.104.

243. Through the acts and omissions alleged in this Complaint, the Defendant, by reason of Plaintiffs' disabilities, has excluded and continues to exclude Plaintiffs and members of the proposed class from participation in the programs, services and activities, including but not limited to Medicaid, SNAP, and TA; denied Plaintiffs and the proposed class the benefits of these programs, services and activities; and subjected Plaintiffs and class members to discrimination in violation of Title II of the ADA, 42 U.S.C. § 12132.

244. The Defendant's acts and omissions, as alleged in this Complaint, have violated and continue to violate the equal access and nondiscrimination requirements of Title II of the ADA including as fleshed out by the implementing regulations effectuating the statute, and have resulted in injury to Plaintiffs and the proposed class. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(1)(i)-(ii) (DOJ regulations implementing ADA).

245. By failing to implement policies or procedures to ensure that the rights of Plaintiffs and the proposed class to be free from discrimination are upheld, Defendant has denied and

continues to deny equal access to Plaintiffs and the proposed class, as eligible benefits applicants and recipients, in violation of Title II of the ADA.

246. The Defendant's failure to implement policies or procedures to ensure that the rights of Plaintiffs and the proposed class to be free from discrimination are upheld, has caused and continues to cause harm to the Plaintiffs and the proposed class through the actual denial or termination, or imminent risk of denial or termination of SNAP, Medicaid, TA, and other benefits and services.

**Second Claim: Violation of the Americans with Disabilities Act: Failure or Refusal to Make Reasonable Modifications**

247. Defendant's acts and omissions, as alleged in this Complaint, have violated and continue to violate Title II of the ADA, by failing to make reasonable accommodations or modifications to the known physical and mental limitations of the Plaintiffs and proposed class members. 42 U.S.C. §12132.

248. Defendant's conduct also violates the DOJ regulations that flesh out and implement Title II of the ADA, which provide that a "public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

249. DOJ regulations implementing Section 504 provide that a recipient of federal funding "shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program." 28 C.F.R. § 41.53.

250. The Defendant's failure to make reasonable accommodations or modifications to SCDSS policies, practices, and procedures has caused and continues to cause harm to the Plaintiffs and the proposed class through the actual denial or termination, or imminent risk of denial or termination of SNAP, Medicaid, TA, and THA benefits and services in violation of Federal Statutes.

**Third Claim: Violation of the Americans with Disabilities Act: Discriminatory Utilization of Criteria or Methods of Administration**

251. The Defendant continues to use and adopt criteria and methods of administration that have the effect of subjecting the Plaintiffs and the proposed class to discrimination based on disability and continue to defeat or substantially impair the accomplishment of the objectives of programs administered by the Defendant, including but not limited to Medicaid, SNAP, and TA, with respect to the Plaintiffs and the proposed class, in violation of Title II of the ADA. 42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.130(b)(3)(i)-(ii).

252. The Defendant's ongoing use and adoption of criteria and methods of administration has caused and continues to cause harm to the Plaintiffs and proposed class through the actual denial or termination, or imminent risk of denial or termination of SNAP, Medicaid, TA, and other benefits and services.

**Fourth Claim: Violation of Section 504 of the Rehabilitation Act: Discriminatory Denial of Access Due to Exclusion and Denial of Participation**

253. Each individual Plaintiff and member of the proposed class is a "qualified individual with a disability" under the meaning of Section 504 of the Rehabilitation Act, 29 U.S.C. §794(a), as an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or

the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by SCDSS.

254. Defendant Pierre, in her official capacity as Commissioner of the SCDSS, administers a "program or activity" and is a "recipient" who is extended "federal financial assistance," as defined by Section 504 of the Rehabilitation Act of 1973 and implementing regulations, thereby rendering Defendant subject to the compliance requirements of Section 504. 29 U.S.C. § 794(b)(1); 28 C.F.R. §§ 41.3(d)-(e); 45 C.F.R. §§ 84.3(f), (h), (k); 7 C.F.R. §§ 15b.3(f)-(g).

255. Defendant's administration of federal benefit programs, including but not limited to Medicaid, SNAP, and TA further constitutes "programs or activities" which are funded in part with "federal financial assistance," subject to Section 504. 29 U.S.C. § 794(b)(1), and implementing regulations.

256. Through the acts and omissions alleged in this Complaint, the Defendant, by reason of Plaintiffs' disabilities, has excluded and continues to exclude Plaintiffs and members of the proposed class from participation in the programs, services and activities, including but not limited to Medicaid, SNAP, and TA; denied Plaintiffs and the proposed class the benefits of these programs, services and activities; and subjected Plaintiffs and class members to discrimination in violation of Section 504 of the Rehabilitation Act.

257. Defendant's acts and omissions, as alleged in this Complaint, have violated and continue to violate the equal access and nondiscrimination requirements of Section 504 of the Rehabilitation Act including as fleshed out by the implementing regulations effectuating the statute, and have resulted in injury to Plaintiffs and the proposed class. 29 U.S.C. §794(a); 28

C.F.R. § 41.51(b)(1)(i)-(ii), (3)(i)-(ii) (DOJ Section 504); 45 C.F.R. § 84.4(b)(i)-(ii), (b)(vii)(4) (HHS Section 504); 7 C.F.R. § 15b.4(b)(i)-(ii), (b)(vii)(4) (FNS Section 504)

258. By failing to implement policies or procedures to ensure that the rights of Plaintiffs and the proposed class to be free from discrimination are upheld, Defendant has denied and continues to deny equal access to Plaintiffs and the proposed class, as eligible benefits applicants and recipients, in violation of Title II of the ADA.

259. The Defendant's failure to implement policies or procedures to ensure that the rights of Plaintiffs and the proposed class to be free from discrimination are upheld, has caused and continues to cause harm to the Plaintiffs and the proposed class through the actual denial or termination, or imminent risk of denial or termination of SNAP, Medicaid, TA, and other benefits and services.

**Fifth Claim: Violation of Section 504 of the Rehabilitation Act: Failure to make Reasonable Accommodations**

260. Defendant's acts and omissions, as alleged in this Complaint, have violated and continue to violate Section 504 of the Rehabilitation Act, by failing to make reasonable accommodations or modifications to the known physical and mental limitations of the Plaintiffs and proposed class members. 29 U.S.C. §794(a).

261. DOJ regulations implementing Section 504 provide that a recipient of federal funding "shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program." 28 C.F.R. § 41.53.

262. The Defendant's failure to make reasonable accommodations or modifications to SCDSS policies, practices, and procedures has caused and continues to cause harm to the Plaintiffs

and the proposed class through the actual denial or termination, or imminent risk of denial or termination of SNAP, Medicaid, TA, and THA benefits and services in violation of Section 504 of the Rehabilitation Act.

**Sixth Claim: Violation of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act: Failure or Refusal to Provide Notice of Rights**

263. Defendant continues to fail or refuse to make information regarding Title II of the ADA and its applicability to benefits and services, including but not limited to SNAP, Medicaid, and TA, available to Plaintiffs and the proposed class, and other individuals with disabilities, thereby preventing them from effectively exercising their rights as disabled persons to meaningful access to benefits, programs and services.

264. Defendant fails to provide Plaintiffs and members of the proposed class who seek reasonable accommodations with written notice of a determination when reasonable accommodations are denied or provided in a different or less complete manner than requested. Because written notice is required by the ADA and Section 504, as is made clear and fleshed out by implementing regulations at 28 C.F.R. § 35.106 (DOJ), 45 C.F.R. § 48.8 (HHS), and 7 C.F.R. §15b.7 (FNS), Defendant violates statute.

**Seventh Claim: Violation of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act: Failure or Refusal to Provide Grievance Procedure**

265. In violation of the ADA and implementing regulations, Defendant continues to fail or refuse to adopt, publish, and implement appropriate and adequate ADA grievance procedures that would reasonably allow Plaintiffs and the proposed class to file grievances and obtain prompt and equitable relief upholding their rights to be free of discrimination based on their disabilities, thereby preventing them from having the opportunity to effectively exercise their rights as persons

with disabilities to meaningful and equal access, with or without reasonable modifications, to benefits, programs, and services, including SNAP, Medicaid, and TA. 28 C.F.R. § 35.107(b).

266. In violation of Section 504 and implementing regulations, Defendant continues to fail or refuse to adopt and publish appropriate and adequate Section 504 grievance procedures that would reasonably allow Plaintiffs and the proposed class to file grievances and obtain prompt and equitable relief upholding violations of their rights to be free of discrimination based on their disabilities, thereby preventing them from having the opportunity to effectively exercise their rights as persons with handicaps to meaningful and equal access, with or without reasonable accommodations, to benefits, programs, and services, including to SNAP, Medicaid, and TA. 45 C.F.R. § 84.7(b) (HHS); 7 C.F.R. § 15b.6(b) (FNS).

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Assume jurisdiction and venue regarding this matter;

B. Certify this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2) with respect to the proposed class identified herein;

C. Enter a declaratory judgment, in accordance with 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declaring that the Defendant's actions and failures or refusals to act violate federal law follows:

1) By excluding or preventing Plaintiffs and class members from participation in the SNAP, Medicaid, and TA benefits, programs, and services of Defendant, and denying Plaintiffs and class members the benefits of these benefits, programs, and services due to their disabilities, thereby subjecting

Plaintiffs and class members to discrimination in violation of Title II of the ADA;

2) By failing or refusing to make reasonable modifications and accommodations to policies, practices and procedures where necessary to avoid discrimination against the Plaintiffs and class members on the basis of disability, with respect to accessing and maintaining eligibility for SNAP, Medicaid, and TA benefits, programs, and services of Defendant and failing to demonstrate that any required accommodations or modifications necessary to avoid discrimination against Plaintiffs and class members would fundamentally alter the nature of the Defendant's services, programs or activities, in violation of Title II of the ADA and Section 504 of the Rehabilitation Act;

3) By utilizing and adopting criteria and methods of administration that have the effect of subjecting the Plaintiffs and class members to discrimination based on disability and defeating or substantially impairing the accomplishment of the objectives of the Defendant's administration of programs including but not limited to SNAP, Medicaid, and TA, with respect to the Plaintiffs, in violation of Title II of the ADA and Section 504;

4) By failing or refusing to make notice and information regarding Title II of the ADA and Section 504 and their applicability to the Defendant's administration of programs including but not limited to SNAP, Medicaid, and TA available to Plaintiffs and class members, thereby preventing them from effectively exercising their rights as persons with disabilities to

meaningful access to those benefits, programs and services, in violation of Title II of the ADA and Section 504 of the Rehabilitation Act;

5) By failing or refusing to adopt appropriate and adequate ADA and Section 504 grievance procedures that reasonably would allow Plaintiffs and class members to file grievances and obtain relief when their rights under the ADA and Section 504 are violated, thereby preventing them from effectively having the opportunity to uphold their rights as persons with disabilities and handicaps to meaningful access, with or without reasonable modifications and accommodations, to programs including but not limited to SNAP, Medicaid, and TA, in violation of Title II of the ADA and Section 504;

D. Enter temporary, preliminary and permanent injunctive relief, pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, requiring Defendant to comply with the Americans with Disabilities Act and Section 504 of the Rehabilitation Act including as fleshed out by the federal regulations implementing both Acts, as follows:

1) Provide prompt, clear and accessible information in the form of adequate and timely notice to Plaintiffs and the class, concerning how to request or access a reasonable accommodation needed to access or retain SNAP, Medicaid, or TA benefits, or to otherwise exercise their rights under the ADA and Section 504 in interactions with SCDSS;

2) Enact, implement, and enforce systemic and countywide policies to ensure that SCDSS provides appropriate screening and comparable methods to identify Plaintiffs and class members as persons with disabilities who

require reasonable accommodations to access and/or maintain SNAP, Medicaid, or TA benefits;

3) Pursuant to systemic and countywide policies, uniformly provide reasonable accommodations on an ongoing basis, as needed, to Plaintiffs and proposed class members who are appropriately identified as requiring or having requested accommodations in order to access and/or maintain SNAP, Medicaid, or TA benefits;

4) Enact, implement and enforce countywide systemic policies to maintain adequate records of those clients who have requested reasonable accommodations and/or who have been determined to require such accommodations, to ensure continued meaningful access to SNAP, Medicaid, or TA benefits for Plaintiffs and the class;

5) Enact, implement and enforce a grievance procedure available to Plaintiffs and proposed class members, to provide prompt and equitable resolution of disputes in all instances when a reasonable accommodation is either denied or is not provided in the manner or form requested, or whenever Defendant otherwise violates the rights of Plaintiffs under the ADA or Section 504.

6) Designate one or more individuals to coordinate the efforts of Defendant to comply with and carry out its responsibilities under the ADA or Section 504, including any investigation of any complaint alleging noncompliance with, or conduct of any actions that would be prohibited by the ADA or Section 504.

7) Develop, implement, and provide adequate, periodic training to SCDSS employees on the rights of benefits applicants and recipients with disabilities under the ADA and Section 504, and the systemic, countywide policies the agency utilizes to address those client rights.

8) Provide quarterly reporting to the Court and to Plaintiffs, regarding the Defendant's:

(a) Use of screening or other means of identification of applicants and recipients with disabilities who require reasonable accommodations to access public benefits;

(b) Extension of offers of reasonable accommodations to applicants and recipients with disabilities and decisions made regarding those offers;

(c) Ongoing tracking of reasonable accommodations requested and corresponding implementation of decisions made to grant those requests;

(d) Investigations conducted and decisions made regarding grievances submitted by applicants and recipients with disabilities to the agency concerning denials of reasonable accommodations or other rights afforded by the ADA or Section 504; and

(e) Conduct staff ADA and Section 504 training.

E. Award Plaintiffs their costs and reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 (ADA); and 29 U.S.C. § 794a(b) (Section 504); and

F. Order such other, further, or different relief as the Court deems equitable and just.

Respectfully submitted, this 25th day of July, 2019.

*/s/ Marc Cohan*

NATIONAL CENTER FOR LAW
AND ECONOMIC JUSTICE
Greg Bass
Marc Cohan
Travis W. England*
Jen Samantha D. Rasay*
275 Seventh Ave, Ste. 1506
New York, NY 10001
Tel. (212) 633-6967
bass@nclej.org
cohan@nclej.org
england@nclej.org
rasay@nclej.org

EMPIRE JUSTICE CENTER
Linda Hassberg
Touro Law Center PAC
225 Eastview Drive, Room 222
Central Islip, NY 11722
Tel. (631) 650-2305

*Attorneys for the Plaintiffs*

* *Application for admission forthcoming.*