# EXHIBIT C

## PLAINTIFF AFFIDAVIT

I, Lance Newkirk, declare under penalty of perjury as follows:

1. I am a resident of Bay Shore, Suffolk County, New York.
2. My wife and I are recipients of Medicaid and Food Stamps ("SNAP") benefits from the Suffolk County Department of Social Services ("DSS").
3. I am willing to serve as a class representative in this lawsuit on behalf of myself and other needy individuals with disabilities living in Suffolk County.
4. I submit this affidavit in support of Plaintiffs' Class Action Complaint challenging the failure of Defendant Commissioner Frances Pierre of the Suffolk County DSS to provide reasonable accommodations pursuant to the Americans with Disabilities Act ("ADA") to give applicants and recipients with disabilities equitable access to the benefits and programs she administers. My lawyers have advised me that these are central issues in this lawsuit.
5. I had an accident at work in 2013 and severely injured my knee. My doctors have told me that the injury is permanent. I have difficulty walking and standing for long periods of time. I use a cane to help me.
6. I live with my wife, Dawn, who has multiple disabilities and uses a wheelchair.
7. My wife and I applied for Temporary Assistance in January 2018, after my worker's compensation ended. Because of our disabilities, we receive assistance from a social services agency. A case worker from the agency helped us fill out the application and faxed it to DSS on our behalf.
8. We contacted the case worker in February 2018 to let her know that we had not heard

from DSS about our application. She told us that she would fax another copy to DSS.

9. We called the case worker again in March 2018 because we still had not heard anything about our application. The case worker called DSS and was told that our application had never been received.

10. We decided to go to DSS Center to hand deliver another copy of the application and supporting documents.

11. On Tuesday, March 27, 2018, I drove to the Smithtown Center. Our case worker had faxed the application to the DSS Southwest Center, but I did not realize that it was a different center from Smithtown.

12. I parked in the DSS Smithtown Center parking lot. I left my wife in the car because I thought it would not take long to drop off the documents and it is difficult for me to get her wheelchair out of the car and help her into it. We had scheduled a doctor's appointment later that morning and planned to drive to the doctor's office from the Center.

13. When I walked into the DSS Center, I did not see any signs for information or assistance for people with disabilities. I saw several windows at the back of the waiting area with signs over them. All the windows had lines in front of them.

14. I chose the window labelled Drop Off Documents and waited in line for about 40 minutes. It was difficult and very painful for me to wait in line for that length of time, but there was nobody that I could ask for help.

15. When I reached the front of the line, I explained why I was there and tried to hand the documents to the worker at the window. The DSS worker looked at the

documents and told me that I had been standing in the wrong line. I said that I should go over to the HEAP window and stand in line there.

16. I could see from where I was standing that the line for the HEAP window was even longer than the line I had been on.

17. I told the DSS worker at the Drop Off Documents window that I was in a lot of pain and had trouble standing in line because of my knee injury. She replied that I could take a seat, wait until the line at the HEAP window had no more people and then go up to that window with my documents.

18. I decided to go over to the line for the HEAP window right away because I was afraid that if I waited until the line got shorter, I would miss my doctor's appointment. I also did not want Dawn to wait in the car by herself for so long.

19. I stood on the HEAP line for another 20 minutes. I was in excruciating pain by that time. I showed the people in line my cane and asked if I could go in front of them to ask a question.

20. I then walked up to the window and asked the DSS worker how long I would have to wait. I explained to her that I was in pain and had difficulty standing and would have to leave soon to make a doctor's appointment for my knee. She told me again that I could sit and wait until the line decreased and then come back up to the window. I said if I go and sit down, I will lost my place on line and asked her if she could give a number or something to allow me to keep my place.

21. She then told me to go to Line 1, all the way on the other side of the building, to get a number. I told her that I couldn't do that. I had been standing for an hour by that time and could not stand any longer. I asked to speak to a supervisor or somebody in

charge. I was told that I would have to wait 10 to 15 minutes for a supervisor to be available because they were all busy. I left the center without submitting our documents.

22. When I got to my doctor's office, my knee was so swollen that the doctor said I could not get the cortisone shot I had come for right away. His nurse gave me an ice pack and had me lie down on a table until the swelling went down.

23. The nurse asked me what happened. When the doctor came back in the room, I told them that I had had to stand in line for a long time at DSS to drop off documents and that's why my knee was so swollen. My doctor replied, "That's ridiculous that they had you standing that long. Did you explain that you were disabled?" I said, "yes" and that I had showed them my cane, but it didn't matter.

24. My wife called the agency case worker that afternoon when we got home and told her that we were unable to hand deliver the application to DSS. She described what had happened to me at the DSS Center.

25. We got a call the next day from an attorney from Empire Justice Center. After explaining to her what had happened when I tried to submit our application to DSS the day before, she said to us that she would contact DSS on our behalf.

26. On Thursday, March 29, 2018, we got a call from Audrey Baird, who said that she was DSS SW Center Manager. She apologized to us and made an appointment with us to come in the next day, Friday, between 9 and 10 a.m.

27. I got to the center at 9 a.m. on Friday, March 30, and told the guard at the front door who I was, as instructed. The security guard told me to have a seat and went to the back.

28. Ms. Baird came out to where I was sitting almost immediately. I explained to her what had happened to me at the DSS Smithtown Center three days before. She replied that I shouldn't have had to wait. Someone should have taken my paperwork right away. She said she would take care of the application right away.

29. Ms. Baird took the paperwork I had brought with me. While I was waiting for her to return, I had a chance to look around. I did not notice any signs in the DSS SW Center advising people with disabilities that they could ask for assistance if they needed help.

30. Ms. Baird came back to where I was sitting and handed me a temporary benefits ("EBT") card. She told me that it had two months worth of SNAP benefits on it and would be ready to use in 3 to 5 days. She also handed me 3 bags of food to tide us over until we could start using the EBT card. She walked outside with me and helped me put the bags in the van.

31. However, I never received anything in writing from DSS approving my request for an ADA reasonable accommodation that I would not have to stand in line when I had to return to a DSS center. After I got home, Ms. Baird called my wife to make sure everything was ok and told us to call her number ahead of time if we needed to go back to the center so we wouldn't have to stand in line again.

32. In early April, a DSS SNAP worker called my wife and interviewed her for SNAP benefits.

33. A few weeks later, we received notices that we had been approved for Medicaid and SNAP, but were denied TA benefits because my wife receives Social Security Disability Income ("SSD").

34. In January of 2019, we received a SNAP recertification packet in the mail. One of the forms asked for information about our housing. Our house is currently in foreclosure and we needed to contact our attorney and get information from the bank in order to complete the form. My wife called DSS and asked for time to complete and submit this form. We were given an additional 2 weeks until February 28, 2019.

35. On February 27, I had a doctor's appointment in the morning. As soon I got back home, we had a call from a DSS worker who told my wife that if we did not submit the SNAP recertification forms to her by 3 p.m. that day, our case would be closed and we would have to start all over again with a new application. My wife replied that she was told that we had until the next day, but the worker insisted on the deadline.

36. Fortunately, we had the information that we needed from the bank. I got back in the car and drove to the DSS SW Center with the recertification forms. We did not have time to call ahead as Ms. Baird had suggested last year.

37. When I arrived at the Center, there was no one who I could ask for help and there were lines in front of all the windows.

38. I went to the line where I thought I should drop off the recertification forms. I showed the people in the line my cane and asked if I could go in front of them to the window to ask a question.

39. At the window, I asked how long I would have to wait to submit my SNAP recertification forms. I explained that I could not stand without pain. The worker did not give me a time, but said I would have to wait in line for my turn or I could take a

seat and wait until the line was finished to bring up my paperwork.

40. I then asked if Ms. Baird was there and was told that she had retired. I asked to speak to a supervisor.

41. The DSS worker said, "Wait a minute," and walked away from the window to talk to someone. She came back and said I would have to wait to speak to a supervisor because they were all busy.

42. I went back to my place on the line and waited about 30 minutes until I got to the window again. I told the worker at the window that I was in severe pain. She took my papers, made copies, and gave me a date-stamped copy and said that was all she needed.

43. No supervisor came to talk to me or to assist me while I was waiting.

44. I was able to get the ADA reasonable accommodation I needed last year in order to submit our benefits application successfully and obtain temporary SNAP benefits only because the Empire Justice Center contacted DSS on our behalf.

45. Ms. Baird, the SW Center Manager at the time, granted us a reasonable accommodation so that I would not have to stand in line to submit documents.

46. However, when I had to return to the DSS Center a year later on short notice, Ms. Baird was no longer there and no one at the Center provided me with the ADA reasonable accommodation I needed, nor did anyone there inform me that I had a right to request an accommodation due to my inability to stand.

47. I asked to speak to a supervisor after I was denied, but no supervisor ever responded to my request.

48. Last month, we received a notice from DSS that our SNAP benefits were being cut from $353 to $72 per month.

49. My wife and took the notice to our care coordinator to discuss. We believed that DSS had reduced our SNAP benefit because we had stated in our recertification application that we were no longer making mortgage payments because our house is in foreclosure.

50. We called DSS and left a message. We wanted to explain that we still have to pay taxes, water and sewage fees, and utilities, but that there was no place on the recertification form to list those costs.

51. We also decided to ask for a fair hearing and faxed the Fair Hearing Request Form from our care coordinator's office.

52. We never received a call back from DSS. My wife tried two more times to call and talk to someone at DSS about our SNAP benefits, but never reached anyone.

53. Our Fair Hearing was scheduled for 1 p.m. on Friday, May 10, 2019, at the DSS Smithtown Center.

54. Dawn and I arrived at 12:45. There was no sign at the center to inform people with disabilities that they could request assistance if needed.

55. There were several windows staffed by DSS workers. We stood on line at Window 1, which had a sign above it that said, General Information & Appointments."

56. We waited on line for about 10 minutes to get to the window. I then told the DSS worker that we were there for a Fair Hearing.

57. She replied that we had to go to the phone on the wall near the entrance, press the voice button, and let them know that we were here for a Hearing.

58. We went over to the wall and noticed a small sign above the phone that said "Fair Hearings." We had not noticed the phone or the sign when we entered the building and there was no one to ask.

59. We waited a few minutes until the phone was free. There was no button that said "voice, " so I pressed the one with a "v." A DSS employee named Mrs. Tooker answered the phone. I gave her my name and stated that my wife and I were there for a Fair Hearing. I also told the worker that my wife and I were both disabled and could not wait for very long.

60. The worker asked if there were seats available. I replied, "Yes, but the seats are hard and I cannot sit for long." Due to my knee injury, I get nerve pain in my lower back if I have to sit in one position for a long time.

61. She gave me a number and told me that we should sit down and wait until the number is called.

62. After waiting an hour, I got up and went back to phone and talked to a worker named Erin. I related the conversation that I had had with Mrs. Tooker and told Erin that we had been waiting an hour and were both experiencing paint and discomfort and asked how much longer we would have to wait. She replied, "We have your information and know you are out there. It shouldn't take too long."

63. I rejoined Dawn and we waited another half an hour. At 2:30, we decided that we could not wait any longer. My wife was in a lot of pain. Her back was spasming and she needed to stretch out, which she could not do in the wheelchair. She also had not yet taken her afternoon pain medication because she wanted to remain alert for the hearing. My leg and lower back were hurting as well.

64. We were packing up to leave when our number was called.

65. Mr. Williams, a Fair Hearing rep, came to the door to let us in. He told us that we had to walk all the way to the back of the building.

66. We went to a room where we talked to Mr. Williams, who agreed to adjourn the hearing and restore our SNAP benefit if we sent him proof of the house expenses we were paying.

67. By the time we left the DSS Center more than 2 hours after we arrived, we were both exhausted and in a lot of pain.

68. I have never received any information from DSS regarding my rights under the Americans with Disabilities Act to reasonable accommodations. On each occasion that I went to a DSS Center and requested a reasonable accommodation that I not be made to stand or sit and wait for a long time due to my disability and my wife's disabilities, my request was either denied or ignored. I was never informed that I had a right to grieve the denials.

69. DSS' failure to provide a reasonable accommodation when I had to go to the Center has caused me harm and hardship. On each occasion, I was in extreme pain by the time I left because I had to stand or sit for such a long time. The long wait also caused my wife a lot of pain and exhaustion when we went together to the Fair Hearing.

70. I worry that I will be forced to stand in line or sit for a long time again the next time I must visit DSS in person. I worry that my wife will not be able to accompany me because she suffers when she has to wait in her wheelchair for a long period. There is no one that I can ask for help when I enter the Center. And the DSS workers do

not offer assistance even when I make it to the front of the line and request help.

71. I also have never received anything in writing from DSS that explains my rights or details a procedure for securing an ADA reasonable accommodation. And, I have never been told by DSS how I can continue to get an ADA reasonable accommodation that was granted to me.

Dated: May 16, 2019

Central Islip, New York,

Lance Newkirk

Sworn before me on this 16th day of

May, 2019,

Notary Public

LINDA R. HASSBERG
Notary Public, State of New York
No. 02HA6182919
Qualified in Suffolk County
Commission Expires March 10, 2020