# EXHIBIT J

DECLARATION IN SUPPORT OF CLASS ACTION COMPLAINT AND MOTION FOR CLASS CERTIFICATION

I, Nicole S., declare under penalty of perjury as follows:

1. I was a resident of Suffolk County from December 2015, until March, 2019, when I moved to Houston, Texas. From January, 2018 until my departure last March, I was homeless and received Temporary Housing Assistance ("THA") and Temporary Assistance ("TA") benefits from the Suffolk County Department of Social Services ("DSS")
2. I submit this affidavit in support of Plaintiffs' Class Action Complaint challenging the failure of Defendant Commissioner Frances Pierre of the Suffolk County DSS to provide reasonable accommodations to give applicants and recipients with disabilities equitable access to the benefits and programs he administers. My lawyers have advised me that these are central issues in this lawsuit.
3. Due to my disabilities, I fear negative, discriminatory responses to identifying myself publicly. I submit this supporting declaration anonymously with the understanding that my full identity will be shared with the Defendant when the Class Action Complaint is filed and served.
4. In 2014, I was diagnosed with Pemphigus Vulgaris (PV), an autoimmune skin disease that causes a lot of pain and makes me very susceptible to infections. My doctors have counseled me to avoid unnecessary contact with people as my immune system is severely compromised. I have contracted infections in the past that brought me close to death.
5. I also have been diagnosed with obsessive compulsive disorder, panic attacks in public areas, depression and generalized anxiety disorder, and have been in treatment for these

psychiatric conditions since 2016.

6. In January 2018, I became homeless and applied to DSS for THA and TA. I was already receiving food stamps (Supplemental Nutrition Assistance Program or SNAP) and Medicaid at the time, and had been found work exempt for SNAP due to my physical and psychiatric disabilities.
7. On the day I applied for THA, I brought with me copies of my medical records and at least 2 letters from my doctors describing my medical conditions. At the intake interview, I stated that I could not live in a group shelter due to my medical conditions and tried to give the DSS worker the documents I had brought with me. Although she took a list of my conditions and the prescriptions I was taking, she responded to my statement by asking "If you can't live in a group shelter, where are you going to live?"
8. After she asked that question, I put the documents away and accepted a THA placement in a group shelter for women because I thought I had no other option. I was not told that I had the right to request an ADA reasonable accommodation for a room by myself with a separate bathroom and kitchen or that I could appeal a denial of my request.
9. I went to the women's shelter, where I shared living quarters and bathrooms with 10 other residents. While I was at the shelter, I was forced to clean up the urine of another resident.
10. I get an intravenous treatment called Rituxan every two to three months for my autoimmune disorder. I have to be tested for tuberculosis (TB) before I get the treatment because I cannot get the treatment if I test positive for TB.
11. A month after I moved into the shelter and after I had to clean up the urine, I was diagnosed with latent TB and the treatment had to be put off. I had never tested positive

before and suspect that the test came back positive because I was unnecessarily exposed to infected urine or some other exposure at the shelter.

12. My doctor faxed a letter to the shelter manager advising that I should be placed in an isolated setting with no shared kitchen or bathroom. The shelter manager forwarded the letter to DSS, and I was immediately placed in a motel in Riverhead and then moved to a motel in Smithtown so I could be closer to my doctors.

13. I remained in the motel in Smithtown until September 17, 2018, when I was hospitalized for spinal surgery. I had told the DSS worker who visited me every week at the motel that I expected to be discharged within 2 days of the surgery. He said that he would tell the motel owner to hold the room for me.

14. The day after the surgery, I called the motel owner and was informed that DSS had not reserved the room for me.

15. I then talked to the hospital social worker who was processing my discharge. She contacted "Audrey" at DSS about a THA placement for me for the night of September 19th. The social worker was informed that I would be placed at TLC. I knew that TLC was a group shelter and told the social worker that I could not go there.

16. I called my doctors to let them know that DSS wanted to place me in a group shelter when I was discharged from the hospital. Dr. Edward Samuel from New York Cancer and Blood Specialists who treats me for PV, faxed a letter dated September 20, 2018, to "Audrey" at DSS, stating that I had to be housed in my own room with no shared bathroom or kitchen because of my autoimmune disease. The social worker said that I would stay at the hospital until she heard back from DSS, which she thought was trying to find a placement for me.

17. On Friday, September 21, the social worker informed me that DSS had denied my request despite receiving the faxed letter from Dr. Samuel. I told the social worker that I knew it was dangerous for me to go to a group shelter and that I couldn't leave the hospital until I had a safe place to stay.

18. I immediately began calling friends and elected officials to see if someone could help me. The social worker told me she would investigate whether my insurance would cover another type of placement.

19. I contacted Dr. Roderick Go from Stony Brook Infectious Diseases, the doctor who is treating me for tuberculous. He wrote a letter and faxed it to the hospital the same day stating that I was being treated with medication to suppress my immune system, increasing my risk of acquiring a life threatening infection. Similar to the other letters, this letter stated that to protect my health, I should not be placed in a group shelter and should not share a bathroom.

20. The following Monday, I reached my psychiatrist, Dr. Asif Karim from Stony Brook Psychiatry Associates. He agreed that it was not safe for me to go to a group shelter and told me that he would fax a letter to the hospital, which he did the following day on September 25th. The hospital forwarded his letter to DSS as well as a second letter from Dr. Samuel and the letter from Dr. Go, all stating my need for a solitary room with no shared bathroom or kitchen.

21. Despite these letters, ample medical documentation, and DSS's previous approval of a THA placement that satisfied my doctors' concerns, I was discharged from the hospital on October 2, 2018, and sent by ambulette to TLC, a group shelter in Huntington. TLC sent me to the emergency room when I arrived because I was having trouble breathing,

but I returned that evening and, slept in a dormitory style room with 15-20 other women and was forced to use shared bathrooms.

22. The next day, October 3, I went to the Smithtown DSS center to ask once again for a more isolated placement. I provided copies of the same physician letters that the hospital had faxed prior to discharge.

23. I waited at DSS most of the day in a full waiting room with public restrooms. I was finally called up to the counter and told that I was being referred back to TLC even though DSS had received all three letters from my doctors stating that I had to be accommodated with a single room and separate kitchen and bathroom for my health.

24. Someone at the center heard what was happening to me and gave me the telephone number for Nassau Suffolk Law Services (NSLS). I called NSLS from DSS and talked to an advocate who told me she would contact DSS on my behalf to try to get my placement changed that night.

25. At 4:30 p.m., I had not heard back from NSLS and was told by the security guards at the center that I had to leave the building. I called my sister, who permitted me to stay with her for the night because I could not go back to the group shelter.

26. My sister dropped me off at the center again the next morning, October 4. I again submitted a written Speedy Request, stating that DSS had rehoused me at TLC the previous day, but I could not stay there due to my medical conditions. I also notified DSS that I had contacted NSLS for assistance.

27. While I waited for a response, I called the advocate from NSLS and let her know that I had gone to my sister’s house the night before because I could not stay at TLC another night and that I had returned to the center that morning and put in another Speedy

Request. The NSLS advocate told me that she would e-mail the DSS Commissioner right away to say that I had been granted a reasonable accommodation to be housed in my own room with my own bathroom and kitchen prior to the most recent hospitalization, that DSS was now refusing to provide such placement, and was not giving any explanation for the refusal.

28. At midday, I was called to the counter and told that DSS would place me in a shelter with my own room and bathroom. I would also have a refrigerator and microwave in the room.

29. No one at DSS ever gave me a written denial of my ADA reasonable accommodation request, nor was I ever informed that I could challenge a denial or disregard of my accommodation request by filing an ADA grievance. In fact, DSS never told me anything about my ADA rights.

30. DSS caused me harm and hardship by repeatedly denying my request for a THA placement that would protect me from risks and complications of my disabling medical conditions. I was forced to stay in the hospital for two additional weeks and then discharged to a group shelter where I was unnecessarily exposed to other people in a way that could have seriously affected my health. I suffered further exposure and serious risk of health by having to wait at the DSS center for an entire day and another half day, in a crowded waiting room with public bathrooms until I finally obtained an appropriate placement.

31. The failure of DSS to process and maintain reasonable accommodations also causes harm and hardship for THA recipients with disabilities such as me when we are hospitalized and need to return to a shelter. People who are ill and homeless should not have to face

the threat of being discharged from a hospital without knowing whether they will have a safe place to sleep in when they leave.

32. In February, 2019, I was hospitalized again with a colon infection called C.DIF. Upon my release from the hospital, DSS placed me in a family shelter in Medford where I had my own room with a microwave and refrigerator as well as a door to the outside that allowed me to avoid shelter staff and other residents as long as I was contagious.

33. I was also notified in early 2019 that my application for Social Security Disability Income had been approved. As soon as I started receiving SSD, I began to look for an apartment in Texas, where housing costs are much cheaper than on Long Island. I found an apartment and moved to Houston in March, 2019.

Dated: 7/18/19

Houston, Texas

Nicole S.

Nicole [redacted]