UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
LANCE NEWKIRK, DOROTHY W., and                                  :
CHRISTOPHER G., on behalf of themselves, and all                :
those similarly situated,                                       :
                                                                :
                                                                :      REPORT &
                                  Plaintiffs,                    :      RECOMMENDATION
                                                                :      19-CV-4283 (NGG) (SMG)
        -against-                                               :
                                                                :
FRANCES PIERRE, Commissioner of the Suffolk                     :
County Department of Social Services, in her official           :
capacity,                                                       :
                                                                :
                                  Defendant.                    :
--------------------------------------------------------------------x
STEVEN M. GOLD, U.S. Magistrate Judge:

## INTRODUCTION

On July 25, 2019, plaintiffs Lance Newkirk, Dorothy W.,[1] and Christopher G., on behalf

of themselves and all those similarly situated, commenced this action against defendant Frances

Pierre, Commissioner of the Suffolk County Department of Social Services (defendant or

"SCDSS"), requesting declaratory and injunctive relief for violations of Title II of the Americans

with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.,* and Section 504 of the Rehabilitation

Act of 1973 ("Section 504"), 29 U.S.C. § 794.  Compl., Dkt. 1.  On the same day, plaintiffs

moved for class certification pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil

Procedure.  Not. of Mot. for Class Cert., Dkt. 2.  On August 7, 2019, plaintiffs filed an Amended

Complaint and an amended motion for class certification to correct an error as to a named

plaintiff's full name.  Am. Compl., Dkt. 9; Am. Not. of Mot. for Class Cert, Dkt. 10.  Following

several adjournments, defendant filed an answer to the Amended Complaint and an opposition to

---

[1]  Pursuant to a joint stipulation of dismissal, Dorothy W. is no longer a plaintiff in this action.  Joint Stip. of
Dismissal, Dkt. 30.

the amended motion for class certification, Answer Dkt 15; Decl. of Drew W. Schirmer in Opp. to Mot. for Class Cert. ("Schirmer Decl."), Dkt. 16, and plaintiff then filed a reply, Reply, Dkt. 26.

United States District Judge Nicholas G. Garaufis has referred the amended motion for class certification to me for report and recommendation. Order dated Jan. 31, 2020. On May 13, 2020, I heard oral argument and reserved decision. Min. Entry dated May 13, 2020, Dkt. 34.

Plaintiffs seek to certify the following class:

> All Suffolk County residents with disabilities who: (1) have applied for or will apply for Supplemental Nutrition Assistance Program ("SNAP"), Medicaid, or Temporary Assistance ("TA"), from the [SCDSS] since July 1, 2018 and are entitled to reasonable accommodations in the application process to participate in or benefit from these programs; and/or (2) have been found eligible for such programs and are entitled to reasonable accommodations in order to enjoy equal opportunity to participate in or benefit from them.

Am. Compl. ¶ 20; Mem. of Law in Supp. of Pls.' Mot. to Certify Class ("Pls.' Mem. of Law") at 1, Dkt. 10-12. For the reasons stated below, I respectfully recommend that the Court grant plaintiffs' amended motion and certify the class as set forth above.

## FACTS

As alleged in plaintiffs' Amended Complaint, SCDSS administers federal and state subsistence benefit programs and services to low-income individuals and families residing in Suffolk County, New York, including: (1) SNAP, a federally-funded nutrition assistance program; (2) Medicaid, a joint federal and state program that provides free or low-cost health coverage; and (3) TA, a joint federal and state program that provides temporary financial and housing assistance and related support services. Am. Compl. ¶ 2. To receive these benefits and

services, individuals must apply either online (SNAP, Medicaid) or in person (SNAP, Medicaid, TA) at one of the five service centers in Suffolk County. *Id.*

The programs and services have complex eligibility standards, requiring individuals, among other things, to comprehend and complete multi-page applications and forms, *id.* ¶ 67, and provide documentary verification of eligibility factors, including "income, immigration or alien status, citizenship, housing, utility and medical expenses, social security numbers, residency, identity, disability (if applicable), household composition[,] and child support obligations and payments," *id.* ¶ 68 (citing 7 C.F.R. § 273.2(f)(1) (SNAP); 42 C.F.R. §§ 435.945, 435.953, 435.956 (Medicaid); 45 C.F.R. § 206.10 (TANF, the federal version of TA, *see id.* ¶ 26); N.Y. Comp. Codes R. & Regs. tit. 18 §§ 351.1, 351.5 (TA)).  Moreover, if written confirmation of eligibility is deemed insufficient, applicants may be required to host home visits or provide third party "collateral contacts" to orally confirm household circumstances.  Am. Compl. ¶ 68 (citing 7 C.F.R. § 273.2(f)(4)(ii)–(iii) (SNAP); N.Y. Comp. Codes R. & Regs. tit. 18 §§ 351.5(b), 351.6 (TA)).  Recipients of SNAP, Medicaid, and TA must periodically recertify their eligibility for aid by completing new forms, participating in interviews where required, and providing updated documentary proof.  Am. Compl. ¶ 78 (citing 7 C.F.R. § 273.14 (SNAP); 42 C.F.R. §§ 435.945, 435.953, 435.956 (Medicaid); N.Y. Comp. Codes R. & Regs. tit. 18 §§ 351.20, 351.21, 351.22, 351.23 (TA) and 387.17 (SNAP)).

Plaintiffs allege that they and the putative class members are low-income individuals with physical and/or mental impairments who have encountered "significant difficulties in working through eligibility procedures—and later, recertification forms—absent reasonable accommodations."  Pls.' Mem. of Law at 5; *see* Am. Compl. ¶ 4; Aff. of Lance Newkirk ("Newkirk Aff."), Dkt. 10-4; Aff. of Meesha Johnson, Dkt. 10-5; Aff. of Christopher G.

("Christopher Aff."), Dkt. 10-6; Aff. of "Charles," Dkt. 10-8; Aff. of "Tiffany," Dkt. 10-9; Aff. of Deborah K., Dkt. 10-10; Aff. of Nicole S., Dkt. 10-11.  According to plaintiffs, although Suffolk County has a policy of providing reasonable accommodations as required by the ADA and Section 504, "[d]efendant has failed to effectively operationalize and implement this policy within SCDSS, leaving benefits applicants or recipients who present with a need for reasonable accommodations and/or who specifically request them without a consistent and effective method of obtaining them."  Am. Compl. ¶ 7.  Plaintiffs allege that defendant's "discriminatory actions and omissions . . . have resulted and continue to result in denial, loss[,] or limited access to benefits and services to which [p]laintiffs and members of the . . . [c]lass are entitled by law." *Id.* ¶ 3.

Plaintiffs offer detailed accounts of the difficulties they encountered when seeking benefits in their Amended Complaint and in affidavits submitted in support of their pending motion for class certification.  Named plaintiff Lance Newkirk experiences pain when walking or standing for long periods of time as a result of a work-related accident that permanently injured his knee.  Am. Compl. ¶¶ 150–51; Newkirk Aff. ¶ 5.  Plaintiffs allege that, on March 27, 2018, Mr. Newkirk went to a SCDSS Service Center to deliver his application forms and supporting documents for several benefits programs.  Am. Compl. ¶ 153; Newkirk Aff. ¶¶ 10–11.  According to plaintiffs, Mr. Newkirk did not see any signs with respect to reasonable accommodations for people with disabilities and waited in line for 40 minutes, despite being in substantial pain, only to be told by a SCDSS worker at the window labeled "Drop-Off" that he was in the wrong line.  Am. Compl. ¶¶ 154–56; Newkirk Aff. ¶¶ 13–15.  He saw that the line he was instructed to enter was longer than the Drop-Off line, and he informed the worker of his disability and that he had difficulty standing in line for long periods of time.  Am. Compl. ¶ 156;

Newkirk Aff. ¶¶ 16–17.  He was told to sit down and wait for the line to become shorter.  Am. Compl. ¶ 157; Newkirk Aff. ¶ 17.

He then waited in another line for 20 minutes before asking a second SCDSS worker about the expected wait time.  Am. Compl. ¶ 158; Newkirk Aff. ¶¶ 19–20.  This worker also told him to sit and wait until the line was shorter.  Am. Compl. ¶ 158; Newkirk Aff. ¶ 20.  Mr. Newkirk asked if he could be given a number to secure his place in line, and the worker told him to walk to the other side of the building to get a numbered ticket.  Am. Compl. ¶ 159; Newkirk Aff. ¶¶ 20–21.  Mr. Newkirk then asked to speak to a supervisor, and the worker told him he would need to wait another 10 or 15 minutes to speak with one.  Am. Compl. ¶ 160; Newkirk Aff. ¶ 21.  Mr. Newkirk could not wait any longer due to a scheduled medical appointment and left the Service Center without submitting his application materials.  Am. Compl. ¶ 161; Newkirk Aff. ¶ 21.  He then obtained the assistance of a public benefits attorney, who contacted SCDSS on his behalf.  Am. Compl. ¶ 163; Newkirk Aff. ¶ 25.  Thereafter, the Service Center manager met with Mr. Newkirk about the application and provided him with her contact information so that he could ask for assistance again in the future.  Am. Compl. ¶ 164; Newkirk Aff. ¶¶ 26–31.  He never received a written document stating that his request for accommodations had been granted.  Am. Compl. ¶ 165; Newkirk Aff. ¶ 31.

Plaintiffs further allege that, in February 2019, when Mr. Newkirk needed to recertify his eligibility for benefits, he was forced to wait in line—again—to submit his recertification materials and was told he could not skip the line; he was also informed that the Service Center manager who had previously assisted him was retired and the other supervisors were all busy. Am. Compl. ¶¶ 166–68; Newkirk Aff. ¶¶ 35–41.  In May 2019, even after Mr. Newkirk informed a SCDSS worker that he and his wife had disabilities that made it difficult for them to wait for

long periods of time, they waited over two hours for their number to be called for a fair hearing with respect to a reduction in their SNAP benefits.  Am. Compl. ¶¶ 169–73; Newkirk Aff. ¶¶ 48– 64.  Due to defendant's repeated conduct, plaintiffs allege that "Mr. Newkirk faces the continued uncertainty and imminent risk of losing access to SNAP benefits each time he must submit documentation at a SCDSS Service Center."  Am. Compl. ¶ 176.

Named plaintiff Christopher G. has a cognitive learning disability and finds it "very challenging to read and understand the questions, to write his answers correctly, and to submit the forms and necessary documentation" when he is required to recertify or reapply for benefits. Am. Compl. ¶ 214; Christopher Aff. ¶ 3.  He is currently receiving SNAP, Medicaid, and TA benefits from SCDSS.  Am. Compl. ¶ 213; Christopher Aff. ¶ 2.  According to plaintiffs, in November 2017, Christopher G. received a letter from SCDSS informing him that his TA benefits would be terminated due to his failure to submit certain required information.  Am. Compl. ¶ 219; Christopher Aff. ¶ 12.  With the assistance of his sister, he requested and obtained a fair hearing.  Am. Compl. ¶ 220; Christopher Aff. ¶ 14.  At the hearing, he brought a letter from his treating physician attesting to his disabilities, and he requested an adjournment in order to obtain a lawyer.  Am. Compl. ¶¶ 221–22; Christopher Aff. ¶¶ 16–17.  He left the Service Center believing that the hearing had been adjourned.  Am. Compl. ¶ 222; Christopher Aff. ¶ 17. However, upon meeting with an attorney, he learned that his request for an adjournment had been denied and that he had lost the fair hearing.  Am. Compl. ¶ 223; Christopher Aff. ¶ 18. With the attorney's assistance, Christopher G. was able to have his TA benefits reinstated.  Am. Compl. ¶ 224; Christopher Aff. ¶ 19.  The attorney also requested that Christopher G. be tested for a cognitive or learning disability and to have SCDSS assist him with future notices, letters,

and instructions, but SCDSS did not respond to this request.  Am. Compl. ¶ 225; Christopher Aff. ¶¶ 20–21.

In May 2018, Christopher G. received another letter informing him that SCDSS was sanctioning him for failing to attend a Department of Labor appointment.  Am. Compl. ¶ 226; Christopher Aff. ¶ 22.  According to plaintiffs, he again requested a fair hearing with the assistance of his sister and obtained an attorney to represent him.  Am. Compl. ¶¶ 226–27; Christopher Aff. ¶ 23.  Ultimately, SCDSS rescinded the sanction.  Am. Compl. ¶ 227; Christopher Aff. ¶ 25.  Christopher G. was evaluated by the Industrial Medical Association in June 2018, and it was determined that he was exempt for six months from the requirement that he work in order to receive benefits.  Am. Compl. ¶ 228; Christopher Aff. ¶ 26.  However, he never received a formal response to his request for reasonable accommodations.  Am. Compl. ¶ 229; Christopher Aff. ¶ 27.

Christopher G. received a notice from SCDSS in April 2019 stating that his benefits were going to be terminated due to his failure to attend an appointment at the SCDSS Service Center.  Am. Compl. ¶ 230; Christopher Aff. ¶ 29.  He asserts that he called SCDSS the week prior to the scheduled appointment to inform them that he could not attend because of a work conflict and that he went to the Service Center the day after the scheduled appointment to obtain a form confirming that he missed his appointment due to work.  Am. Compl. ¶¶ 230–31; Christopher Aff. ¶¶ 30–32.  The friend he worked for on the date of the scheduled appointment refused to sign the form, so Christopher G. returned to the Service Center to speak with a SCDSS worker.  Am. Compl. ¶¶ 231–32; Christopher Aff. ¶¶ 33–34.  However, he was turned away.  Am. Compl. ¶ 232; Christopher Aff. ¶ 35.

According to plaintiffs, Christopher G. then requested and attended a fair hearing on his own. Am. Compl. ¶ 234; Christopher Aff. ¶ 37. At the hearing, the officer did not ask him about his disabilities or requests for accommodations. Am. Compl. ¶ 234; Christopher Aff. ¶ 38. Thereafter, he called an attorney, who contacted SCDSS on his behalf to request a reinstatement of his TA benefits. Am. Compl. ¶ 235; Christopher Aff. ¶¶ 39–40. SCDSS informed the attorney that Christopher G. had lost the hearing and that he was required to complete a new application to obtain his benefits. Am. Compl. ¶ 235; Christopher Aff. ¶ 40. In May 2019, he went to the Service Center but did not receive assistance from SCDSS workers in filling out a new application. Am. Compl. ¶ 237; Christopher Aff. ¶¶ 42–43. One worker processed his application and provided him with SNAP benefits and a rent voucher. Am. Compl. ¶ 237; Christopher Aff. ¶ 44. However, because his benefits had been terminated in the meantime, he was not able to pay his rent on time in May 2019 and "feared eviction and homelessness." Am. Compl. ¶ 238; Christopher Aff. ¶ 42. As a result, plaintiffs allege, Christopher G. "has suffered undue termination of his benefits and continues to face imminent loss of access to his benefits each time he receives a notice or letter that he does not understand and/or fails to comply with eligibility requirements." Am. Compl. ¶ 215.

Based on these allegations, plaintiffs seek a judgment declaring that defendant's actions and failures or refusals to act violate Title II of the ADA and Section 504 of the Rehabilitation Act and injunctive relief requiring defendant to comply with these statutes and implementing regulations. Am. Compl. at 63–67. The requested injunctive relief specifically includes requiring defendant to (1) provide adequate and timely information as to how to "request or access a reasonable accommodation needed to access or retain" benefits; (2) "[e]nact, implement, and enforce systemic and countywide policies to ensure that SCDSS provides appropriate

screening . . . to identify . . . persons with disabilities who require reasonable accommodations to access and/or maintain" benefits; (3) "uniformly provide reasonable accommodations on an ongoing basis," as needed to those "who are appropriately identified as requiring or having requested accommodations in order to access and/or maintain" benefits; (4) "maintain adequate records of those clients who have requested reasonable accommodations and/or who have been determined to require such accommodations"; (5) develop "a grievance procedure . . . to provide prompt and equitable resolution of disputes in all instances when a reasonable accommodation is either denied or is not provided in the manner or form requested"; (6) "[d]esignate one or more individuals to coordinate the efforts of [d]efendant to comply with and carry out its responsibilities under the ADA or Section 504"; (7) provide training to SCDSS employees "on the rights of benefits applicants and recipients with disabilities under the ADA and Section 504"; and (8) provide quarterly reporting to the Court and plaintiffs regarding defendant's policies and actions with respect to reasonable accommodations.  *Id.* at 65–67*; see also id.* ¶ 10.

## DISCUSSION

## I.    Legal Standard for Class Certification

A party seeking certification of a class must satisfy "the four prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation." *See Marisol A. v. Giuliani*, 126 F.3d 372, 375 (2d Cir. 1997).  The Court must also find that one of the three sets of criteria set forth in Rule 23(b) has been met. *See id.* at 376; *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).

Here, plaintiffs seek to certify a class under Rule 23(b)(2), which permits class certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is

appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Finally, in addition to these explicit requirements, the Second Circuit has imposed an "implied requirement of ascertainability." *B & R Supermarket, Inc. v. MasterCard Int'l Inc.*, 2018 WL 1335355, at *7 (E.D.N.Y. Mar. 14, 2018) (citing *In re Petrobras Sec.*, 862 F.3d 250, 266 (2d Cir. 2017)).

Plaintiffs bear the burden of establishing each of these prerequisites to certification by a preponderance of the evidence. *See Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). In deciding whether plaintiffs have met their burden, "the Court may examine not only the pleadings but also the evidentiary record, including any affidavits and results of discovery." *Guadagna v. Zucker*, 332 F.R.D. 86, 91 (E.D.N.Y. 2019); *see also Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 571 (2d Cir. 1982). Moreover, it is proper for a district court to accept allegations in the complaint as true for a class certification motion, *see Waggoner v. Barclays PLC*, 875 F.3d 79, 85 n.5 (2d Cir. 2017), and to refrain from conducting "a preliminary inquiry into the merits" of the case, *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 177 (1974). Indeed, plaintiffs seeking class certification are not required to establish the merits of their underlying substantive claims: "a class plaintiff who otherwise meets the demands of 23(a) and (b) should not be found to be disqualified solely by an advance determination that his claim is predictably not a winning claim." *Sirota*, 673 F.2d at 571 (internal quotation marks and citation omitted).

The Court's analysis of whether the relevant requirements of Rule 23 have been met must be "rigorous." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). Nevertheless, the Second Circuit has emphasized that Rule 23 should be given a "liberal rather than restrictive construction." *Marisol A.*, 126 F.3d at 377 (internal quotation marks and citation omitted). "[T]o deny a class action simply because all of the allegations of the class do not fit together like pieces in a jigsaw puzzle would destroy much of the utility of Rule 23." *Cortigiano v.*

*Oceanview Manor Home for Adults*, 227 F.R.D. 194, 203 (E.D.N.Y. 2005) (internal quotation marks and citation omitted).  "Therefore, it seems beyond peradventure that the Second Circuit's general preference is for granting rather than denying class certification."  *Id.* (internal quotation marks and citation omitted); *see also Hasemann v. Gerber Prod. Co.*, 331 F.R.D. 239, 254 (E.D.N.Y. 2019).

## II.    The Requirements of Rule 23(a)

Rule 23(a) sets out four prerequisites for certifying a class action:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

### A.  Numerosity

In the Second Circuit, "numerosity is presumed at a level of 40 members."  *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).  "Courts have not required evidence of exact class size or identity of class members to satisfy the numerosity requirement," *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993), as "it is permissible for . . . court[s] to rely on reasonable inferences drawn from available facts," *Hill v. City of New York*, 2019 WL 1900503, at *5 (E.D.N.Y. Apr. 29, 2019) (internal quotation marks, alteration, and citation omitted).

"Nevertheless, as the bearers of the burden to show joinder is impracticable, plaintiffs must show some evidence of or reasonably estimate the number of class members."  *Pecere v. Empire Blue Cross & Blue Shield*, 194 F.R.D. 66, 70 (E.D.N.Y. 2000) (internal quotation marks, alterations, and citation omitted).  "Impracticable does not mean impossible, but simply difficult

11

or inconvenient." *Id.* Relevant considerations in assessing impracticability "include judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members." *Robidoux*, 987 F.2d at 936.

Here, because "[d]efendant does not maintain comprehensive data or documentation that . . . identifies which applicants and recipients of its benefits and services have disabilities," plaintiffs proffer evidence drawn from publicly available sources indicating that the proposed class consists of thousands of members. Declaration of Linda R. Hassberg ("Hassberg Decl.") ¶ 14, Dkt. 10-1. Specifically, plaintiffs submit two reports from the New York State Office of Temporary and Disability Assistance ("OTDA") Welfare Management System ("WMS"), stating that, in January 2019, SCDSS received 2,745 applications for TA, 2,663 applications for SNAP, and 3,255 applications for Medicaid, and provided benefits and services in 7,004 TA cases, 53,858 SNAP cases, and 65,385 Medicaid cases. Pls.' Mem. of Law at 10; Hassberg Decl. ¶¶ 7, 8; WMS WinR 4113 Report, Dkt. 10-2; WMS WinR 1240 Report, Dkt. 10-3. Plaintiffs explain that "[t]hese large numbers represent the norm," as defendant's "2018 Annual Report stated . . . that an average of 55,978 households received SNAP benefits every month in that year." Hassberg Decl. ¶ 9; *see* 2018 Annual Report at 18, SCDSS, https://www.suffolkcountyny.gov/Portals/0/formsdocs/socialservices/2018%20Annual%20Repor t.pdf (last visited July 31, 2020) (reporting the 2018 caseload and indicating that caseloads were even larger in 2014, 2015, 2016, and 2017).

Additionally, plaintiffs assert that the OTDA monthly caseload data identifying "22,244 recipients of federal Supplemental Security In[come] ("SSI") benefits residing in Suffolk County

in April 2019" is relevant here because "SSI recipients are categorically eligible for SNAP and

Medicaid."  Pls.' Mem. of Law at 10; *see* Hassberg Decl. ¶ 13; Temporary and Disability

Assistance Statistics April 2019 at 20, OTDA, http://otda.ny.gov/resources/

caseload/2019/2019-04-stats.pdf (last visited July 31, 2020).  Plaintiffs further point to U.S.

census data showing that 141,355 individuals with a disability live in Suffolk County and

comprise 9.5% of the County's population, and that, as of 2017, "6% were living at less than

50% of the poverty level; 13.3% were living at less than 100% of the poverty level; and 17.2%

were living at less than 125% of the poverty level."  Pls.' Mem. of Law at 11; *see* Hassberg Decl.

¶¶ 10, 11; Selected Social Characteristics in the United States, 2017: American Community

Survey 5-Year Estimates, Suffolk County, N.Y. (Table DP02), U.S. Census Bureau,

https://data.census.gov/cedsci/table?g=0500000US36103&tid=ACSDP5Y2017.DP02&q=DP02

(last visited July 31, 2020); Selected Characteristics of People at Specified Levels of Poverty in

the Past 12 Months, 2017: American Community Survey 5-Year Estimates, Suffolk County,

N.Y. (Table S1703), U.S. Census Bureau, https://data.census.gov/cedsci/table?g

=0500000US36103&tid=ACSST5Y2017.S1703&q=S1703 (last visited July 31, 2020).

This publicly available data indicates that thousands of Suffolk County residents are

likely to come within the proposed class definition.  *See Brooklyn Ctr. for Indep. of the Disabled

v. Bloomberg*, 290 F.R.D. 409, 418 (S.D.N.Y. 2012) ("Relying on the 2008 American

Community Survey from the United States Census Bureau . . . plaintiffs estimate that there are

roughly 900,000 people with disabilities in New York City . . . , a number clearly rendering

joinder impracticable"); *Cortigiano*, 227 F.R.D. at 204 (finding numerosity to be satisfied where

plaintiffs proffered "publicly available census data" showing that "more than 150 residents at

Oceanview come within the class definition which they advance"); *see also Folsom v. Blum*, 87

F.R.D. 443, 445 (S.D.N.Y. 1980) (finding numerosity to be satisfied where the "class will undoubtedly number in the hundreds at the very least"); *Hurley v. Toia*, 432 F. Supp. 1170, 1174 (S.D.N.Y. 1977) (same), *aff'd*, 573 F.2d 1291 (2d Cir. 1977).  Additionally, joinder of similarly situated individuals is impracticable, given that (1) plaintiffs and the proposed class members are economically disadvantaged and have a wide range of disabilities; (2) the consolidation of potentially thousands of individual suits serves judicial economy and avoids the possibility of inconsistent results; and (3) an injunction requiring defendant to comply with the statutory mandates of the ADA and Section 504 would affect all potential class members.  *See Robidoux*, 987 F.2d at 936.

Contrary to defendant's assertion, *see* Mem. of Law in Opp. to Mot. for Class Cert. ("Def.'s Mem. of Law") at 6, Dkt. 16-8, plaintiffs need not show the number of persons who were actually harmed or whether any plaintiff, named or potential, suffered actual harm or was adversely affected by defendant's purported conduct.  As stated above, the proposed class consists of Suffolk County residents with disabilities *who have applied for, will apply, or have been found eligible* for SNAP, Medicaid, or TA from SCDSS since July 1, 2018, and who are entitled to reasonable accommodations in the application process or to enjoy equal opportunity to participate in or benefit from the programs.  *See* Pls.' Mem. of Law at 1.  The gravamen of plaintiffs' claims, in other words, is not that they or the proposed class members suffered actual injuries but that they confronted hurdles when they attempted to secure or maintain benefits, and that they were sometimes denied benefits they were entitled to receive, because defendant failed to provide them reasonable accommodations as required by the ADA and Section 504.  *See Brooklyn Ctr. for Indep. of the Disabled*, 290 F.R.D. at 418 (finding the numerosity element satisfied where plaintiffs sought certification of a class of persons with disabilities who were

denied the benefits of an emergency preparedness program, noting that "the gravamen of plaintiffs' claims is not that they or other class members were injured during Hurricane Irene or some other disaster, but that they have been deprived of a benefit—namely, appropriate emergency preparedness planning—that the rest of the population has been given"). For this reason, and as further explained below in the Court's analysis of commonality, the tailoring of declaratory or injunctive relief would not "represent a difficult and complex issue for the Court[.]" Def.'s Mem. of Law at 7.

Defendant also argues that "all persons with disabilities who may forever after apply for public benefits" are not a "legitimate class," and that such a broad class definition will have the effect of "convert[ing] the Court into the permanent micro-manager of DSS." Def.'s Mem. of Law at 7. However, plaintiffs do not seek injunctive relief in perpetuity; rather, they seek "entry of a classwide order compelling [d]efendant to implement policies and procedures that offer class members reasonable accommodations only until such time as [d]efendant demonstrates to the satisfaction of the Court that its policies and practices comply with the law." Reply at 6.

For all the reasons discussed above, numerosity is satisfied.

B. Commonality

Rule 23(a)(2) requires there to be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Supreme Court has noted that "[a]ny competently crafted class complaint literally raises common questions." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (internal quotation marks and citation omitted). "What matters to class certification . . . is not the raising of common questions—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 350 (emphasis in original) (internal quotation marks and citation omitted). Rule 23(a)(2) requires

15

that there be a common contention that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

  "That said, a single common issue of law or fact suffices to satisfy Rule 23(a)(2)." *Elkind v. Revlon Consumer Prod. Corp.*, 2017 WL 9480894, at *8 (E.D.N.Y. Mar. 9, 2017) (internal quotation marks and citation omitted), *report and recommendation adopted*, 2017 WL 1169552 (E.D.N.Y. Mar. 29, 2017). "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015) (internal quotation marks and citation omitted). Notably, the "individual circumstances of the class members may differ without precluding class certification," so long as there is "a common nucleus of operative facts or an issue that affects all members of the class." *Butto v. Collecto Inc.*, 290 F.R.D. 372, 392 (E.D.N.Y. 2013).

Here, commonality arguably presents a closer question than numerosity because the proposed class is comprised of individuals with diverse disabilities who are affected by defendant's alleged failure to comply with the statutory mandates of the ADA and Section 504 in different ways. Nevertheless, I conclude that commonality is satisfied because "[t]he claims at issue . . . are systemic, not individual." *R. A-G ex rel. R.B. v. Buffalo City Sch. Dist. Bd. of Educ.*, 2013 WL 3354424, at *10 (W.D.N.Y. July 3, 2013), *aff'd*, 569 F. App'x 41 (2d Cir. 2014).

Defendant argues that the Supreme Court's decision in *Dukes* precludes a finding of commonality in this case. Def.'s Mem. of Law at 9–10. Defendant stresses in particular the Court's statement in *Dukes* that "[c]ommonality requires the plaintiff to demonstrate that class

members have suffered the same injury."  564 U.S. at 349–50 (internal quotation marks and citation omitted).  However, "the disparate impact of a challenged policy or regulation does not defeat class certification," particularly "where[, as here,] plaintiffs request declaratory and injunctive relief against a defendant engaging in a common course of conduct toward them, and there is therefore no need for *individualized* determinations of the propriety of injunctive relief." *R. A-G ex rel. R.B.*, 2013 WL 3354424, at *10 (quoting *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994)).

    *Dukes*, moreover, is readily distinguishable from this case.  Plaintiffs in *Dukes* sought to certify a class of more than one million employees who alleged that "the discretion exercised by their local supervisors over pay and promotion matters" resulted in gender-based discrimination. 564 U.S. at 342.  The Court held that plaintiffs failed to establish commonality because they could not point to any "testing procedure or other companywide evaluation method that [could] be charged with bias" or any "general policy of discrimination." *Id.* at 353.  Rather, plaintiffs relied on a "'policy' of *allowing discretion* by local supervisors over employment matters," which the Court characterized as "the opposite of a uniform employment practice that would provide the commonality needed for a class action." *Id.* at 355 (emphasis in original).

    Here, in contrast, plaintiffs raise questions about policies and procedures, or the absence of them, followed by defendant that affect all members of the putative class.  The common questions plaintiffs raise include, among others, whether defendant is "failing or refusing to afford reasonable accommodations to [p]laintiffs and class members that they need to participate in or benefit from SNAP, Medicaid, or TA" or "failing to sufficiently record applicants and recipients' disabilities and the status of reasonable accommodations requested and provided, both within a case and across SCDSS benefit programs, to ensure proper implementation of the rights

of [p]laintiffs and the proposed class under the ADA and Section 504."  Pls.' Mem of Law at 12, 13.[2]  The systemic nature of plaintiffs' allegations is further demonstrated by the relief they seek, which includes an injunction requiring defendant to enact and implement countywide policies requiring screening that will identify class members as persons with disabilities and ensure that they are provided with reasonable accommodations.  Am. Compl. at 65–67.

These common questions are "capable of classwide resolution," *Dukes*, 564 U.S. at 350, because plaintiffs' assertions as to defendant's acts, omissions, and failures are "not specific to any particular [p]laintiff."  *Brooklyn Ctr. for Indep. of the Disabled*, 290 F.R.D. at 419 (internal quotation marks and citation omitted); *see also Westchester Indep. Living Ctr., Inc. v. State Univ. of N.Y., Purchase Coll.*, 331 F.R.D. 279, 293 (S.D.N.Y. 2019) ("[D]espite variations in the buildings to which putative class members were denied access, and even despite the fact that some class members were able to access certain buildings while others were not, the core issue presented is whether Defendants engaged in a general course of conduct of not providing accessible paths of travel throughout the Campus, thereby denying people with mobility disabilities meaningful access.  The answer to this question will resolve all of the class claims.").

Applying similar reasoning, courts have certified classes as broad as the one proposed here, even after *Dukes*.  For example, in *Brooklyn Ctr. for Indep. of the Disabled*, plaintiffs

---

[2]  Plaintiffs raise other common questions including whether SCDSS is "failing or refusing to adopt and implement adequate ADA and Section 504-compliant procedures for informing consumers with disabilities of their rights to nondiscrimination, and to request reasonable accommodations"; "failing or refusing to adopt and implement adequate procedures to provide timely, adequate, written determinations of agency decisions pertaining to requests for reasonable accommodations"; "failing or refusing to adopt and implement adequate ADA and Section 504-compliant procedures for informing applicants and recipients with disabilities of a prompt and equitable grievance process if their requests for reasonable accommodations or rights under the ADA and Section 504 are denied"; and "failing or refusing to make available to [p]laintiffs and other interested persons information regarding the provisions of the ADA and Section 504 and their applicability to persons with disabilities seeking access to benefits administered under SNAP, Medicaid, or TA, and further, to make this information available in a manner necessary to apprise these persons of these protections, including through alternative means of communication for persons with vision or hearing impairments or with cognitive disabilities that impair or prohibit comprehension of and ability to navigate program requirements."  Pls.' Mem. of Law at 12–13.

alleged that New York City's emergency preparedness plans inadequately addressed the needs of individuals with disabilities. 290 F.R.D. at 413. The district court granted plaintiffs' motion to certify a class consisting of "[a]ll people with disabilities, as defined by the [ADA], who [we]re within the City of New York and the jurisdiction served by the City of New York's emergency preparedness programs and services." *Id.* at 420–21. The proposed class consisted of persons with "diverse disabilities," which meant, as the Court noted, that the class members would "not all be affected by the alleged omissions in the City's plan the same way." *Id.* at 418. Nevertheless, the Court held that the issue in that case was "common to the proposed class because it challenge[d] acts and omission[s] of the [City] that [we]re not specific to any particular [p]laintiff." *Id.* at 419 (internal quotation marks and citation omitted).

The district court reached a similar result in *R. A-G ex rel. R.B. See* 2013 WL 3354424, at *9. Plaintiffs in that case sought declaratory and injunctive relief on behalf of a proposed class for claimed violations of the Individuals with Disabilities Education Improvement Act ("IDEA") and Section 504 of the Rehabilitation Act. *Id.* The Court granted plaintiffs' motion to certify a class consisting of "children, and parents of children, between the ages of 5 and 21 residing in the Buffalo City School District, present and future, who are classified as disabled per the definition in [IDEA] . . . and receive related services." *Id.* at *13. Although the putative class included students with a wide range of disabilities, the Court held that commonality was satisfied because "[t]he claims at issue . . . [we]re systemic[.]" *Id.* at *10.

Finally, in *Toney-Dick v. Doar*, 2013 WL 5295221, at *3 (S.D.N.Y. Sept. 16, 2013), the district court certified two subclasses, each of which included "individuals who . . . have or had a physical or mental impairment that substantially limits one or more major life activities within the meaning of the [ADA] or have a record of such an impairment." The Court held that "there

19

[wa]s at least one central common question at issue in this case—whether the Federal, State, and City Defendants violated the law by failing to provide reasonable accommodations to individuals with disabilities." *Id.* at *6.

The analysis that led the courts in these cases to conclude that commonality was established applies here as well. The central issue in this case is whether SCDSS fails, systemically, to provide reasonable accommodations to individuals with disabilities seeking to apply for or retain public assistance benefits, and lacks policies and procedures to identify those individuals and the reasonable accommodations they require. Accordingly, commonality is satisfied.

C. Typicality

Rule 23(a)(3) requires that the claims asserted by the named plaintiffs be "typical" of the claims of the class. "Typicality ensures that class representatives have the proper incentive to prove all elements of the cause of action that would be presented by individual members of the class if they were pursuing their own individualized actions." *Hoeffner v. D'Amato*, 2019 WL 1428367, at *7 (E.D.N.Y. Mar. 29, 2019).

"Although the analysis of typicality and commonality 'tend to merge,' each is 'distinct.'" *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 532 (E.D.N.Y. 2017) (quoting *Morangelli v. Chemed Corp.*, 275 F.R.D. 99, 104 (E.D.N.Y. 2011)). "The commonality requirement tests the definition of the class itself, while the typicality requirement focuses on *how* the named plaintiff's claims compare to the claims of the other class members." *Id.* (emphasis in original) (internal quotation marks and citation omitted). "Rule 23(a)(3)'s typicality requirement is satisfied when each class member's claim arises from the same course of events and each class

20

member makes similar legal arguments to prove the defendant's liability." *Robidoux*, 987 F.2d at 936.

"When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Id.* at 936–37. "[T]he existence of defenses unique to the named plaintiff may preclude class certification only if the unique defenses threaten to become the focus of the litigation." *Butto*, 290 F.R.D. at 384 (internal quotation marks and citation omitted). Overall, typicality is not a "highly demanding" requirement. *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 63 (E.D.N.Y. 2015) (internal quotation marks and citation omitted).

Plaintiffs assert that that they have established typicality because the legal theories underlying their claims are the same as those of the proposed class, and all class members would "benefit from the named plaintiffs' action." Pls.' Mem. of Law at 17 (quoting *Cortigiano*, 227 F.R.D. at 206). Specifically, plaintiffs assert that the "[n]amed [p]laintiffs and putative class members have each applied for, are currently receiving, or will apply for SNAP, Medicaid, or TA benefits and have experienced or are at imminent risk of experiencing discrimination . . . on the basis of their disabilities," for reasons including, but not limited to, defendant's "failing or refusing to provide reasonable accommodations[.]" *Id.* In short, then, the Amended Complaint alleges that the same unlawful conduct—defendant's systemic failure to comply with the statutory mandates of the ADA and Section 504—was directed at or affected both the named plaintiffs and the class sought to be represented. The fact that there may be minor variations in how defendant treated different plaintiffs or the putative class members based on their different disabilities does not render the claims of the named plaintiffs atypical. *See Robidoux*, 987 F.2d

21

at 936–37; *Cortigiano*, 227 F.R.D. at 206. Rather, because all members of the class would benefit from the named plaintiffs' action, typicality is satisfied.[3]

### D.  Adequacy of Representation

Rule 23(a)(4) provides that "the representative parties [must] fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Determination of adequacy typically entails inquiry as to whether: 1) plaintiff[s'] interests are antagonistic to the interest of other members of the class and 2) plaintiff[s'] attorneys are qualified, experienced[,] and able to conduct the litigation." *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007) (internal quotation marks and citation omitted); *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 30 (E.D.N.Y. 2019) (same). As to the first inquiry, "Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prod., Inc*, 521 U.S. at 625. "Only a fundamental conflict will defeat the adequacy of representation requirement." *Lewis v. Alert Ambulette Serv. Corp.*, 2012 WL 170049, at *11 (E.D.N.Y. Jan. 19, 2012).

Here, there is no dispute that these conditions are met. Plaintiffs are requesting declaratory and injunctive relief against a defendant who they allege is engaging in a common course of conduct toward them and the putative class members, and there is no indication that the named plaintiffs' interests in obtaining the requested relief are antagonistic to those of the other

---

[3] Defendant argues that some putative class members do not "even belong in the proposed class, with one individual no longer living in Suffolk County and another no longer eligible to receive public benefits." Def.'s Mem. of Law at 12 (citing Aff. of Deborah K. & Aff. of Nicole S.). However, it is not an impediment to class certification that certain putative class members may no longer belong in the proposed class, given that the named plaintiffs currently reside in Suffolk County and have applied for, will apply, or have been found eligible for SNAP, Medicaid, or TA from SCDSS since July 1, 2018, and are entitled to reasonable accommodations in the application process or to enjoy equal opportunity to participate in or benefit from those programs. *See Cortigiano*, 227 F.R.D. at 206 ("[T]he fact that one of the named plaintiffs no longer resides at Oceanview is not an impediment to class certification because each of the other named plaintiffs currently resides there.").

class members.  *See Brooklyn Ctr. for Indep. of the Disabled*, 290 F.R.D. at 419; *see also M.G. v. New York City Dep't of Educ.*, 162 F. Supp. 3d 216, 237 (S.D.N.Y. 2016).  Furthermore, as evidenced by Ms. Hassberg's declaration, class counsel—the Empire Justice Center and the National Center for Law and Economic Justice—are able, qualified, and experienced. Specifically, the declaration states that "[b]oth offices have experience in matters of constitutional law, the [ADA], class action litigation, and the law governing public benefits" and have "litigated dozens of class actions in this District and other courts within this Circuit." Hassberg Decl. ¶ 19.  Moreover, "[t]he National Center for Law and Economic Justice has previously handled other cases where the nature of the disability-related claims was similar to those raised here."  *Id.*  Therefore, adequacy of representation is satisfied.

 E. The Implied Requirement of Ascertainability

 Plaintiffs allege that "both parties, as well as the Court, can readily identify each member of the proposed class" by referring to "the ADA statutory and regulatory definitions and rules of construction regarding disability at each stage of this litigation" and defendant's common application packet, which includes "multiple questions regarding disability that applicants are required to answer."  Pls.' Mem. Of Law at 22–23; *see* Hassberg Decl. ¶¶ 21–37.  Defendant, in turn, argues that "[t]he proposed class, which would include all future disabled applicants for public benefits without temporal limitation, abjectly fails the ascertainability requirement." Def.'s Mem. Of Law at 13.

 The Second Circuit has "'recognized an implied requirement of ascertainability in Rule 23,' which demands that a class be 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'"  *In re Petrobras Sec.*, 862 F.3d at 260 (quoting *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015)).  In the

context of a motion to certify a Rule 23(b)(2) class, the ascertainability requirement is less critical because "a chief objective of this rule is to provide broad injunctive relief to 'large and amorphous' classes not capable of certification under Rule 23(b)(3)." *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co. (In re Vitamin C Antitrust Litig.)*, 279 F.R.D. 90, 116 (E.D.N.Y. 2012) (quoting *Marisol A.*, 126 F.3d at 378); *see also Westchester Indep. Living Ctr., Inc.*, 331 F.R.D. at 299.  In any event, "class members need not be ascertainable prior to class certification; they need only be ascertainable at some point in the case." *Brooklyn Ctr. For Indep. Of the Disabled*, 290 F.R.D. at 419 n.3.

Here, the class is sufficiently defined for the Court to determine whether a particular individual is a class member.  As plaintiffs contend, members of the class can be identified "through a manageable and administratively feasible process that uses the definition of disability under the ADA and [d]efendant's own common application packet, which includes multiple mandatory questions regarding an applicant's disability."  Reply at 10 (internal quotation marks and citation omitted).  This eligibility information, moreover, appears to be readily accessible, as it is "entered into the computerized New York State Welfare Management Systems ("WMS"), from which [d]efendant may generate data reports as well as information specific to individual applicants and recipients."  Hassberg Decl. ¶ 27.  Finally, and contrary to defendant's assertion, "[t]he fact that the class includes future members . . . does not pose an obstacle to certification." *Westchester Indep. Living Ctr., Inc.*, 331 F.R.D. at 299 (internal quotation marks and citations omitted).

For the foregoing reasons, I conclude that the requirement of ascertainability is satisfied.

### III.     The Requirements of Rule 23(b)

As stated above, a class action may be maintained under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Each of the claims at issue here is based on defendant's systemic failure or refusal to comply with the ADA and Section 504, and the requested declaratory and injunctive relief "would inure to the benefit of all class members[.]"  *Brown v. Giuliani*, 158 F.R.D. 251, 269 (E.D.N.Y. 1994); *see also Brooklyn Ctr. for Indep. of the Disabled*, 290 F.R.D. at 420.  Notably, cases like this one, "alleging systemic failure of governmental bodies to properly fulfill statutory requirements, have been held to be appropriate for class certification under Rule 23(b)(2)." *Raymond v. Rowland*, 220 F.R.D. 173, 181 (D. Conn. 2004).  Indeed, the Supreme Court has held that "[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of the types of cases properly certified under Rule 23(b)(2).  *Amchem Prod., Inc.*, 521 U.S. at 614.  Accordingly, class certification under Rule 23(b)(2) is appropriate in this case.

**CONCLUSION**

For the reasons stated above, I respectfully recommend that the Court grant plaintiffs' motion to certify a Rule 23(b)(2) class consisting of all Suffolk County residents with disabilities who: (a) have applied for or will apply for SNAP, Medicaid, or TA from SCDSS since July 1, 2018, and are entitled to reasonable accommodations in the application process to participate in or benefit from these programs; and/or (b) have been found eligible for such programs and are entitled to reasonable accommodations in order to enjoy equal opportunity to participate in or benefit from them.

Any objections to the recommendations made in this Report must be made within fourteen days after filing of this Report and Recommendation and, in any event, on or before August 25, 2020. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). Failure to file timely objections may waive the right to appeal the District Court's order. *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (discussing waiver under the former ten-day limit).

_____/s/_____

Steven M. Gold
United States Magistrate Judge

Brooklyn, New York
August 11, 2020

U:\#JAV 2019-2020\Newkirk v. Pierre, 19-cv-4283\Final R&R.docx